JOSEPH P. CHAVES, *Appellant*, v. BELLE SPRINGER CHAVES,
*Appellee*.

Opinion Filed April 24, 1920.

1.  In passing upon a demurrer to a bill in equity every presumption is against the bill.

2.  Where there are contradictory or inconsistent allegations in a bill its equity will be tested by the weaker rather than the stronger allegations.

3.  The only foundation of an order for alimony, suit money and counsel fees *pendente lite* is the fact of marriage between the parties, and that relations should be made to appear at least *prima facie* by proof or admission before a reference to a Master is made.

4.  When the marriage status is *prima facie* established by admission or proof the court has the power to require the husband to provide suit money for the wife to enable her to cope with him in the litigation.

5.  Where the bill of complaint is sworn to an alleges that the defendant denies the marital relation, the issue as to the denial of the marriage status by the defendant is as effectively raised as if denial had been stated in a sworn answer.

6.  To constitute a common law marriage at least two essentials must appear; mutual consent and capacity of the parties; and the agreement itself must be to become husband and wife immediately from the time when the mutual consent is given; which is known as words of present assent, *per verba de presenti*.

7.  Neither cohabitation and repute nor circumstances, whose sole function is to show mutual consent of the parties, establishes a common law marriage of itself, for to constitute the marriage relation *de presenti* the parties must contemplate that the relation is being created at the present time when the contract is being made.

8. If the parties agree presently to take each other for husband and wife and from time to time live together professedly in that relation, there is a marriage binding upon the parties.

9. That form of the common law marriage known as consent *per verba de futuro cum copula*, which proceeded upon the theory that while the promise *de futuro* of itself had no effect, yet if the parties who had exchanged the promise had copula, its effect was to interpose a presumption of present consent which converted the engagement into an irregular marriage, is not recognized in this State.

10. Where one of the parties is actually legally and *bona fide* domiciled in this State as a citizen thereof, the chancery courts have jurisdiction to enforce the duty of maintenance and support due from the husband to the wife by awarding alimony, particularly where personal service is made upon the husband within this jurisdiction. Two years residence is not required when the proceeding is under Section 1934, General Statutes.

11. Legal residence consists of facts and intention, both must concur; and under Section 1934, G. S., our courts have jurisdiction to enforce the duty of maintenance and support due from a husband to the wife where one of the parties is actually, legally and *bona fide* domiciled in this State as a citizen thereof.

12. Legal residence may be acquired by one who, coming from another State actually lives in this State with the intention of permanently remaining here.

13. To give jurisdiction to the court to entertain a cause brought under Section 1934, General Statutes, it is only necessary for her to show that either she or her husband has, in a proper and legitimate manner, become at the time of the application, a *bona fide* resident and citizen of this State.

An Appeal from the Circuit Court for Hillsborough County, F. M. Robles, Judge.

Decree reversed.

*Hilton S. Hampton,* for Appellant;

*J. T. Watson,* for Appellee.

ANDREWS, Circuit Judge.—Defendant in error, hereinafter called the plaintiff, filed her bill of complaint in the Circuit Court of Hillsborough County on October 1, 1918, seeking alimony and suit money and a permanent decree for support under the provisions of Section 1934, of the General Statutes of Florida of 1906.

The bill of complaint, omitting formal and unnecessary parts, alleges:

"1.   Your oratrix represents that she is at this time a resident of the City of Tampa and State of Florida, and that she has been regularly and continuously residing in said city and State since the 29th day of April, 1918, and that the defendant J. P. Chaves is now in the City of Tampa and State of Florida, or is somewhere in the vicinity of such city.

"That on the 29th day of April, 1918, the said defendant and your oratrix became married and legally constituted as man and wife, although no marriage ceremony creating or establishing such relationship was ever performed; that the marriage constituted between the said parties was accomplished in the following manner:

"That prior to said date your oratrix had known the said defendant in the City of Mobile Ala., and during such acquaintance in said last mentioned place, the said defendant had requested your oratrix to marry him; that your oratrix consented to do so; that she subsequently

came to Tampa at the said defendant's request for the purpose of marrying him and making a home in said City of Tampa for both of the said parties; that she arrived in the City of Tampa on the 29th day of April, 1918; that the said defendant was in said city at such time awaiting her and did at such time register at the Olive Hotel in the said city and State, both your oratrix and himself, as Mr. and Mrs. Chaves; that on the night of April 29th, 1918, and in fact during the entire time that your oratrix and the said defendant were living at said Olive Hotel, being registered there as husband and wife, they actually lived together as husband and wife, and cohabitated as such; that the said defendant held your oratrix out as his wife at that time and at all subsequent times up until a date and time to be hereinafter mentioned; that the said defendant stated to your oratrix on the first night after her arrival in the City of Tampa on April 29th as aforesaid, that they were in fact husband and wife, thereby agreeing to become husband and wife and putting such agreement into effect by subsequently cohabiting with your oratrix as his wife; that thereafter the said defendant and your oratrix lived together as man and wife during the time they remained in the said hotel and that the said defendant together with your oratrix rented an apartment on Verne street in the City of Tampa, for your oratrix as his wife, and purchased the necessary furnishings for the upkeep and maintenance of a home for himself and your oratrix and made such purchases for your oratrix as his wife, and actually lived in said home all of the time that the said defendant was in the City of Tampa after the renting thereof until at a later date to be hereinafter referred to.

"That during the time that your oratrix and the said defendant were living in said home, your oratrix was

held out by the said defendant as his wife and introduced
to his friends as such, and that she so considered her-
self; that she introduced the defendant as her husband
to friends and acquaintances, and so considered him
as such; that your oratrix in fact agreed to be the wife
of the said defendant on the first night after her arrival
in the City of Tampa when the two were registered and
living together at the said Olive Hotel; that the said
defendant has ever since held your oratrix out as his
wife up until a date to be hereinafter referred to, and
has treated her as such; that the said defendant actually
agreed on April 29th, the date when your oratrix arrived
in the City of Tampa, that your oratrix was in fact his
wife.

"Wherefore your oratrix respectfully shows to Your
Honor and claims that she and the defendant became
man and wife as of April 29th, when they each agreed
that such relationship existed between them and when
they began living together and cohabited with one another
as such.

"3. Your oratrix shows to Your Honor that on or
about the 21st day of September, A. D. 1918, the said
defendant was arrested by the Federal authorities in the
City of Tampa under the charge of violating the Federal
law commonly known as the White Slave Act; that on
said date your oratrix was also taken into custody and
required to go to the office of the United States Com-
missioner in the Federal Building in the City of Tampa,
Fla., and sign a paper, your oratrix respectfully repre-
senting that she does not know what the contents of
this paper which she signed were, although she was told
that her husband had been arrested for violating the
White Slave Act; that she signed such paper upon the

direction and command of the Court Officers or persons whom she supposed were Court Officers and who directed her and instructed her to sign the same; that it was not her intention at such time, or at any other time, to charge her said husband with violating the White Slave law, although this complainant admits that when she signed such paper she did not know whether the law would recognize the defendant as her husband when they had gone through no marriage ceremony, your oratrix respectfully representing that she has ascertained since the signing of said paper that the agreement actually entered into between herself and said defendant to be man and wife perfected and put into execution by cohabitation between them, under the laws of this State constituted a legal marriage which, if your oratrix had know at the time that she was called upon to sign the paper or charge by the Federal authorities hereinbefore referred to, she would have refused to comply with the instructions and demands of the said Federal authorities. Your oratrix respectfully representing to the court that she was practically forced to sign the paper above referred to in that she assumed that the Federal officers had the right and authority to compel her to place her signature thereto.

"4. Your oratrix further shows unto Your Honor that on the 21st day of September, A. D. 1918, the said defendant left their home, he being placed under arrest at such time, as hereinbefore described, and that he has not returned to said home since.

"5. Your oratrix further shows to Your Honor that the said defendant has refused to recognize her as his wife since such arrest and has in effect disclaimed the existence of any marriage status between them since said

time and that he has to all intents and purposes deserted her; that he has refused since such time, and still continues to refuse to provide your oratrix with the necessary means of support; that he has not contributed to her support since such arrest and refused so to do; that he disclaims any liability or responsibility for her support."

The bill further alleges the poverty of the complainant, and that defendant has a large and substantial income as captain of a vessel; that she has reasons to believe that the defendant intends to depart from the State of Florida without providing for her support; that plaintiff is entitled to decree of permanent support, also a decree for alimony and suit money *pendente lite*. The bill has the usual prayer, also a specific prayer asking the court to require defendant to pay complainant a reasonable sum *pendente lite* for court costs, attorneys fees and that a final decree be entered adjuding defendant to pay her permanent alimony for support, and that the court issue a writ of *Ne Exeat* against defendant.

On October 7, 1918, the defendant filed a demurrer to the bill of complaint and the same come on to be heard on October 12, 1918, which resulted in the demurrer being overruled. On October 19, 1918, an order of reference to a Master was entered to take testimony as to temporary alimony *pendente lite,* suit money, etc. On October 29, 1918, the court entered an order awarding alimony temporarily based upon said testimony, and on November 23, 1918, respective counsel entered into a stipulation to submit the same testimony for final hearing, and on the same date a decree was entered awarding permanent alimony and counsel fees. From this decree defendant entered his appeal on November 23, 1918.

Defendant's answer was filed on October 25, 1918, but the court in his order of October 29, 1918, did not consider it and for the reason, as the court states, that the same was not filed till after a reference to the Master had been made, and the same status prevailed at the entry of final decree.

The demurrer filed to the bill of complaint reads as follows, omitting formal and unnecessary parts:

"1.    There is no equity in said bill.

"2.    Said bill shows on its face that the cohabitation between complainant and defendant was illicit and in violation of law.

"3.    Because the bill shows on its face a violation of law by the complainant which will prevent a court of equity interposing in her behalf.

"4.    Said bill is in form a bill for alimony, and shows on its face a denial of marriage by the defendant which will prevent the awarding of alimony pendente lite for counsel fees.

"5.    Said-bill shows on its face that the complainant has denied under oath before court officers having jurisdiction of both parties the facts which she states in her bill as to marriage.

"6.    Said bill admits the denial by the complainant of her marriage before government officers, and alleges no fact by which this court can say that duress or fear was employed by such court officer to cause the signing of the paper referred to in the bill.

"7.    Because the words 'practically forced,' as used with respect to a written denial of marriage, do not constitute a negation of duress.

"8. Because said bill shows on its face illicit cohabitation by the complainant with the defendant, and fails to allege any attempt on her part to procure or bring about a lawful marriage in accordance with the laws of Florida.

"9. Because said bill shows on its face to be based upon a promise of marriage by the defendant in consideration of the complainant coming to Tampa and cohabiting with him.

"10. Because said bill fails to deny that prior to April 29, 1918, the complainant and defendant were guilty of illicit cohabitation."

The first assignment of error is based upon the order of the court overruling the demurrer. It is observed that the demurrer in substance attacks the bill of complaint as being fatally defective in that it fails to set up a legal common law marriage. It will be observed from paragraph 2 of the bill of complaint that the marriage relation is claimed by virtue of a common law marriage, and the particulars relied upon to constitute such marriage are set up in her sworn bill.

The complainant having pleaded the facts which she deems sufficient to constitute what is known in law as a common law marriage, it becomes necessary for us to apply the allegations strictly to what may be termed the generally accepted essentials of a marriage of this nature, which is also often spoken of in law books as "irregular marriages." This rule is "that in passing upon a demurrer to a bill in equity every presumption is against the bill." Murrell v. Peterson, 57 Fla. 480, 49 South. Rep. 31; Barco v. Doyle, 50 Fla. 488, 39 South. Rep. 103. Another rule is that "Where there are contradictory or inconsistent allegations in a bill, its equity will be test-

ed by the weaker rather than by the stronger allegations." Durham v. Edwards, 50 Fla. 495, 38 South. Rep. 926; Barco v. Doyle, *supra;* Godwin v. Phifer, 51 Fla. 441, 41 South. Rep. 597.

This court in several cases has recognized the common law marriage as a legal marriage in this State. Warren v. Warren, 66 Fla. 138, 63 South. Rep. 726; Caras v. Hendrix, 62 Fla. 446, 57 South. Rep. 345; Bagdad Land & Lumber Co. v. Poston, 69 Fla. 340, 68 South. Rep. 180; Daniels v. Sams, 17 Fla. 487. In none of the above cases, however, does it appear that an attempt was made to define what in law constitutes a common law marriage but went far enough to state that there was not shown in the particular case considered sufficient proof to raise the presumption that there was or was not shown a valid common law marriage. Neither does it appear that in any of these cases, there was a denial by one of the parties the fact of the marriage, nor an undertaking by the complainant to set up the matters upon which she relied to constitute the common law marriage.

This court has held that "the only foundation of an order for alimony, suit money, and counsel fees *pendente lite,* is the fact of marriage between the parties." Banks v. Banks, 42 Fla. 362, 29 South. Rep. 318. Also held that "in suits for alimony the marriage relation between the parties should in general be made to appear at least *prima facie* by proof or admission before a reference to a Master is made for the purpose of taking testimony as to alimony, suit money and counsel fees, because if the marital relation does not exist, the defendant is not liable." Wood v. Wood, 56 Fla. 882, 47 South. Rep. 560. The above principles were again announced and followed

in the later case of Arendall v. Arendall, 61 Fla. 496, 54 South. Rep. 957. The above is the rule whether the bill of complaint be attacked by demurrer or not. The case of Fountain v. Fountain, 80 Ark. 481, 97 S. W. Rep. 656, 10 Ann. Cas. 557, and notes also cited in the above cases.

In the case of Wood v. Wood, *supra,* this court said: "When the marriage status is *prima facie* established by *admission* or *proof,* the court has the power to require the husband to provide suit money for the wife to enable her to cope with him in the litigation." In the case of Banks v. Bauks, *supra,* the bill of complaint was not sworn to which alleged the marriage, and the marriage was specifically denied under oath by the defendant in his answer; it was held that the reference to a Master to take testimony as to the allowance of alimony and suit money was error in that the marriage relation was not sufficiently shown. In the case at bar, the bill of complaint, which is sworn to alleges that the defendant *denies* the marriage, which we consider raises the question of denial or admission of defendant as effectively as if set up in a sworn answer. The above is mentioned for the reason that the trial court declined to consider the answer of defendant denying the marriage when granting the order for temporary alimony. It appears that the bill of complaint anticipated the defense of non-married by stating that the defendant "disclaimed the existence of the marriage status between them." The bill of complaint alleges that they agreed to become married and thereupon considered themselves married on April 29, 1918, but it is observed that she alleges that on September 21, 1918, (about five months later) when defendant was arrested for "White Slavery," she did not know that the agreement "entered into between herself

and said defendant to be man and wife perfected and put into execution by cohabitation between them under the laws of this State constituted a legal marriage;" that if she had, she would not have signed the papers for Federal authorities, which in effect disclaimed any marriage between herself and this defendant. Thus it appears that the bill of complaint shows that the defendant denies the marriage, and we are of the opinion that the matters stated in the bill to overcome the denial, are not suffiicent under the now well accepted law as to what essentials must appear to constitute a valid common law marriage.

There are at least two essentials of a common law marriage; (1) mutual consent, and (2) capacity. It is the agreement itself, and not the form in which it is couched which constitutes the contract, and the words used or the ceremony performed are like cohabitation and repute merely evidence of marriage. There must be an agreement to become husband and wife immediately from the time when the mutual consent is given. It is now generally accepted where the common law marriage is recognized, that the marriage relation may be formed in the above way, which is known as words of present assent, *per verba de presenti*, and without the interposition of witnesses or of any person lawfully authorized to solemnize marriage, or to join persons in marriage. 18 R. C. L. pp. 391 & 392, Secs. 12 and 13; 1 Bish. Mar., Divor. and Separation, Secs. 340 *et seq.*; Grigsby v. Reib, 105 Tex. 597, 153 S. W. Rep. 1124, L. R. A. 1915E 1, and notes; 14 Am. & Eng. Ency. Law (1st ed.) 508. Circumstances cannot establish a marriage where there is in fact no matrimonial consent or desire, and circumstances are valuable in establishing a marriage, only so

far as they tend to show consent. It is not even essential to require "cohabitation and repute," whose sole function is to show consent, though it is often resorted to as *evidence* to establish it and properly so. "The agreement may be written or oral, with or without witnesses, and may be proved like any other contract. If both parties enter into a mutual contract by which they assume toward each other the relation of husband and wife, and they regard this relation as one which is to continue so long as both shall live, and they understand that neither one, nor both can rescind the contract or destroy the relation, then they are married in fact. The parties, in order to constitute the marriage relation *de presenti,* must contemplate that the relation is being created at the present time when the contract is being made. There can be no contract *per verba de presenti* where the marital status is to become fixed in the future, although there is nothing inconsistent in fixing the status *per verba de presenti,* and agreeing that the marriage then constituted shall be solemnized publicly at a future day." Grigsby v. Reib, *supra.*

Judge COOLEY said that whatever the form of a ceremony, or even where the ceremony is dispensed with, if the parties agree presently to take each other for husband and wife, and from time to time live together. professedly in that relation, there is a marriage binding upon the parties. Hutchins v. Kimmell, 31 Mich. 125, 18 Am. Rep. 164. To the same effect see Meister v. Moore, 96 U. S. 76, 24 L. Ed. 826.

It was declared by the United States Supreme Court that at common law, marriage is a civil contract, and may be made *per verba de presenti* without attending ceremonies, religious or civil; but that, upon considera-

tion of public policy, and for the protection of the parties and their children, some public recognition of the marriage is necessary as evidence of its existence. See this and other authorities gathered in a most valuable and exhaustive note in L. R. A. 1915E 30, *et seq.* If this form of marriage is regarded as undesirable, the remedy lies in the entire abrogation of the common law on that subject, a course that, in the present age, has much to commend it. The legislative branch of our State Government has not thus far seen fit to change the law, except to provide a method of procuring license, solemnizing and recording execution of same, which has been held by this court, in the case of Caras v. Hendrix, *supra,* to be merely directory and not affecting the validity of marriages consummated as at common law; and, until such time, the common law will necessarily prevail.

The bill of complaint taken as a whole would probably be sufficient to show that form of common law marriage known as consent *per verba de futuro cum copula,* which proceeded upon the theory that while the promise *de futuro* of itself had no effect, yet if the parties who had exchanged the promise had intercourse, its effect was to interpose a presumption of present consent which converted the engagement into an irregular marriage. This was upheld as a marriage upon the fiction that at the time of the copula consent *de presenti* was mutually given by the parties in consequence of the anterior promise. It is now generally held that an express future condition is absolutely fatal to a claim of marriage and cannot be explained away by circumstances. It shows mental reservations which are incompatable with consent. 18 R. C. L. p. 393, Sec. 14; Grigsby v. Reib, *supra, et seq.* If cohabitation and repute as set up in the bill were

sufficient to establish a common law marriage where one of the parties denies the relation and contract, the bill might be sufficient *prima facie* in view of other allegations, as a basis for this suit, but the complainant shows in her sworn bill a mental reservation on her part in that she states that she did not know (nearly five months after the alleged contract) that she was in fact the wife of defendant. The form of common law marriage known as *per verba de futuro cum copula* is not recognized in this State. See Marsicano v. Marsicano decided at this term.

It is insisted by plaintiff in error that the allegation of *residence* in the bill of complaint when considered with other portions of the bill, is insufficient to show jurisdiction of the trial court under Section 1934, of the General Statues of 1906. In the case of Wood v. Wood, *supra,* this court held that "Where one of the parties is actually, legally and *bona fide* domiciled in this State, as a citizen thereof, the chancery courts have jurisdiction to enforce the duty of maintenance and support due from the husband to the wife by awarding alimony, particularly where personal service is made upon the husband within this jurisdiction. Two years residence is not required as when the proceedings is under Section 1933." Miller v. Miller, 33 Fla. 453, 15 South. Rep. 222; Shrader v. Shrader, 36 Fla. 502, 18 South. Rep. 672; Donnelly v. Donnelly, 39 Fla. 229, 22 South. Rep. 648. The more recent case of Warren v. Warren, 73 Fla. 764, 75 South. Rep. 35, goes more extensively into the question of necessary residence in this State to furnish a legal basis for suits under the statute in question. In this last case, this court said: "Legal residence consists of facts and intention, both must concur." In the Miller case

this court held that "under Section 1934, our courts have jurisdiction to enforce the duty of maintenance and support due from a husband to the wife where one of the parties 'is actually, legally and *bona fide* domiciled in this State as a citizen thereof.'" In the Shrader case, *supra,* (where relief was sought under Section 1934) this court held that "In these cases, all that is necessary to show is that one of the parties is a *bona fide resident* of this State." In the Warren case, *supra,* this court held that "Legal residence may be acquired by one who, coming from another State, actually lives in this State with the intention of permanently remaining here." Again in the case of Miller v. Miller, *supra,* it was held that "in so far as the question of the jurisdiction of the court to entertain the cause is concerned, it is only necessary for her to show that either she or her husband has, in a proper and legitimate manner, become, at the time of the application, a *bona fide* resident and citizen of this State."

There is no averment in the bill of complaint that either of the parties is a *"bona fide* resident" of this State, and other portions of the bill weaken, rather than sustain this jurisdictional averment. For the reasons stated, the trial court should have sustained the demurrer to the bill of complaint.

It could serve no useful purpose to consider other assignments of error, as they will not likely occur again, it is deemed advisable to say, however, for future guidance, that we have examined the evidence submitted in the record, and it is our opinion that the same does not sustain the allegations of the bill above considered.

For the reasons given, the decree is reversed.

PER CURIAM.—The record in this cause having been considered by this court, and the foregoing opinion prepared under Chapter 7837 Acts of 1919, adopted by the court as its opinion, it is considered, ordered and adjudged by the court that the decree herein be and the same is hereby reversed.

BROWNE, C. J., AND TAYLOR, WHITFIELD AND WEST, J. J., concur.

ELLIS, J., not participating.