73 So.2d 830 (1954)
CHAACHOU
v.
CHAACHOU et al.
Supreme Court of Florida. Division A.
April 27, 1954.
Rehearing Denied June 21, 1954.
*831 E.F.P. Brigham, Phillip Goldman, George W. Wright, Jr., and James Pilafian, Miami, for petitioner.
Pallot, Silver & Mulloy, Dubbin, Blatt & Schiff, Miami, and Turnbull & Pepper, Tallahassee, for respondents.
MATHEWS, Justice.
This was a suit for divorce, suit money and counsel fees, and for alimony both temporary and permanent. The relief sought is based upon the allegations of a common law marriage. The petition for certiorari seeks to quash an order holding that a common law marriage was not sufficiently established to warrant alimony, suit money and attorneys' fees pendente lite.
Khudourie Chaachou, the respondent, in his answer denied the existence of the common law marriage and all allegations of the bill of complaint with reference thereto. It is contended that the respondent accepted the benefits, advantages and pleasures of a common law marriage, publicly and openly, for many years and is now not willing to accept and bear the responsibilities and obligations of such marriage.
The Chancellor made an order appointing a Special Master for the purpose of taking the testimony of the parties upon the issue of "temporary alimony, temporary suit money and temporary counsel fees to be awarded to the plaintiff and for the purposes of filing his recommendations to the Court, both on the facts and the law."
It should be noted that in the order of reference the Chancellor did not sever the *832 issues as to the common law marriage and the issues of temporary alimony, suit money and counsel fees. For all that appears in the order, the Master was appointed for the purpose of taking the testimony upon the issue of alimony, suit money and counsel fees only. Notwithstanding the fact that the order of reference did not sever the issues, the Master's Report contains the following:
"* * * the Master, as well as counsel for the respective parties proceeded in the cause in the light of the rule laid down by our Supreme Court in the case of Fincher v. Fincher, Fla., 55 So.2d 800, * * *."
In the case of Fincher v. Fincher, Fla., 55 So.2d 800, 803, the opinion, after holding that respondent failed to allege or prove a prima facie marriage contract, stated that the Court felt it advisable to outline to the Bench and Bar the procedure which should be followed when a complaint alleging a common law marriage, and seeking alimony and attorneys' fees pendente lite, was denied by the defendant. The advice given was not necessary for a determination of the issues presented in the Fincher case. In that case the hearing was had before the Chancellor. The Chancellor made an order that the plaintiff had proven a prima facie case of the existence of a valid marriage. The Court stated that it appeared from the record that the Chancellor had severed the issues and the opinion, then stated, "The Chancellor should sever the issues and before hearing the plaintiff on her application for alimony and attorneys' fees pendente lite should determine conclusively whether a common-law marriage actually exists." In the same opinion, the Court stated that a wife, in the divorce suit, should "at least make a prima facie showing of the existence of the marriage relationship before being heard on her application for temporary alimony and attorneys' fees." In a concluding paragraph the Court said:
"Nothing said herein shall be taken as abrogating or modifying the time honored rule that when a prima facie case has been established the burden of proof thereafter shifts to the defendant."
In the present case the Chancellor did not sever the issues and so far as the order of the Chancellor was concerned, the Master was vested with authority to take the testimony of the parties only upon the issues of whether temporary alimony, suit money and counsel fees be awarded to the plaintiff, and for the purpose of filing his recommendations to the Court with reference thereto.
The order did not authorize the Master to determine conclusively whether a common law marriage actually exists. He was required under our previous rulings to determine whether or not a prima facie showing of such a marriage existed as a basis for any recommendation with reference to alimony and attorneys' fees.
It appears that forty-seven witnesses testified before the Master in this case and in addition thereto, there were several written depositions, all of which constituted in excess of two thousand pages of testimony. In excess of one hundred exhibits were filed and an additional fifty exhibits were marked for identification.
It appears that the petitioner was about forty-six years of age and was born in the City of Hodgen in Turkey. The respondent was born in the City of Bagdad in Iraq, of Jewish parents. Each party has been naturalized as an American citizen. They had known each other since 1935, when the then-husband of the petitioner had a business in Atlanta, Georgia. The acquaintanceship began as a business relationship, whereby the petitioner and her then-husband bought rugs for retail sale from the respondent who was conducting a wholesale and importing Imperial Persian and Chinese rug company in the City of New York. After an accident, in 1941 near Folkston, Georgia, in which the respondent was seriously injured, the relationship between the parties became closer when the petitioner rendered considerable assistance to the respondent while he was *833 in a hospital in Folkston, Georgia and in Emory University Hospital in Atlanta, Georgia. The result of this acquaintanceship was that the respondent induced the petitioner to go to Miami Beach and manage a large hotel which he bought. The relationship continued on the most friendly and intimate terms until sometime in December, 1944. Prior to December in 1944 the petitioner was divorced from her first husband.
When petitioner left Atlanta and came to Miami in 1942 she assumed the name of Phillips and was known by that name to her friends and acquaintances until December of 1944. During that period of time she resided at the Savoy Plaza Hotel in Apartment 322, which had been reserved for her. The Master found that this apartment served as a home for both the petitioner and the respondent, during the time that they were in Miami Beach from 1942 to December, 1944.
In the Spring of 1944 the respondent purchased a home at 5041 Collins Avenue, Miami Beach, Florida. The petitioner alleged the marriage took place in this home in December, 1944. From the time of the purchase of this home until the time of the alleged marriage, the petitioner testified that she purchased various and sundry furnishings and fixtures for the property and did a good deal of re-decorating and furnishing under instructions from the respondent; that he purchased it for their home and wanted her to fix it up to suit her taste, which she did.
During this period of time the respondent was in New York but he returned to Miami Beach in December 1944, before Christmas. The Master concluded this date to be between the 10th and 25th of December. Petitioner testified that respondent called her from New York and left word with one of the clerks at the hotel that he was coming to Miami and wanted the petitioner to meet him at the station. She did meet him at the station and drove to another hotel, which had been acquired by the respondent, so that he could inspect it, and from there went to 5041 Collins Avenue where, petitioner testified, the marriage took place.
The petitioner on direct examination testified as follows:
"Q. What happened there? A. Well, he asked me to be his wife forever, he love me and keep me forever, and I accepted him as my husband.
"Q. Were you married with a wedding certificate? A. No sir.
"Q. And how did you consider yourself married? A. Well, the reason he told me that he has an old mother, very strict 
"Q. No, I asked the question, how did you consider yourself married? A. Well, I accepted him as my husband. He said he didn't want it in the paper, because his mother very strict Jew, and if she hears he married Gentile she would die, so I had respect for him and his family.
"Q. Well, then did you consider yourself married? A. I certainly did. I believe that he is my husband.
"Q. Did he accept you as his wife? A. He certainly did.
"Q. Was your marriage consummated that night? A. I don't know that word.
"Q. Did you have relations that night as husband and wife? A. Yes sir, we were husband and wife."
On cross examination the plaintiff testified with reference to the marriage contract as follows:
"Q. You testified that the defendant, Khudourie Chaachou, proposed marriage to you. When was that? A. Three times he proposed to me, sir.
"Q. When was the last time? A. Last time was that day I was married.
"Q. That was in December of 1944? A. Yes sir. He wanted me to be his wife forever.

*834 "Q. What did he say to you? A. I told you. He said, `I love you, I want you to be mine forever. I never loved another woman like I did you,' and I accepted him as my husband.
"Q. You remember those words fairly distinctly? A. Well, as much as I can remember. And I mean, that is the way he talked.
* * * * * *
"Q. When you selected the residence at 5041 Collins Avenue, did you know then that it was going to be your own home? A. Well, that is what he said to me.
"Q. When did he tell you that? A. He said `Select a home and decorate to your own taste, so we can get married.'
"Q. What did you tell him at that time? A. Well, how am I going to tell him, I was so much in love with the man, so I don't know.
"Q. Well, what did you tell him? A. Well, I thought he was good and wonderful to me.
"Q. But what did you tell him? A. I don't remember what I said, now sir.
"Q. Did you say you would marry him, or you wouldn't? A. I had in my mind to marry him at that time, sir. I mean, when he asked me, I thought well, if everything is all right, if it is Lord's will, let it be."
In the Master's Report the above testimony was referred to when he stated:
"The words and phrases above quoted are sufficient to constitute present assent, per verba de praesenti, and if used and spoken between the plaintiff and defendant in the manner and under the circumstances related by the plaintiff constituted a legal contract of marriage between the parties, and the Master so finds. Marsicano v. Marsicano, 79 Fla. 278, 84 So. 156; Chaves v. Chaves, 79 Fla. 602, 84 So. 672. As was stated in Chaves v. Chaves, there are at least two essentials of common-law marriage, (1) Mutual consent, and (2) Capacity. "In the instant case there is no question but that these parties possessed the capacity to contract marriage, because they were both unmarried in December, 1944. It is true that the plaintiff had been previously married, but she secured a final decree of divorce in Dade County, Florida on September 11, 1944 (tr. 6). So it is that the only question to be decided on this issue is the one of mutual consent, or to state it in plain words, did the plaintiff and defendant in the presence of each other, on a night in December of 1944 at 5041 Collins Avenue, Miami Beach, Florida, agree to become husband and wife?
* * * * * *
"In this suit, as is so many times the case, there were no witnesses to the ceremony. The defendant has denied the marriage. Proof, therefore, of the marriage contract between these parties must depend upon the following:
"1. The testimony of the plaintiff.
"2. General repute and cohabitation.
"A cursory examination of the testimony in this cause reveals, without question that the parties cohabited for a period of at least five years, beginning in December of 1944 and extending until about December of 1949, and the Master so finds. Both the plaintiff and defendant admitted this fact.
"The testimony leaves little doubt on the question of repute during this period of time. The fact that the plaintiff and defendant held themselves out as husband and wife to their friends, acquaintances and the general public, and for that matter to the world, during this five year period of time was amply established by the *835 many witnesses produced by the plaintiff, and in many instances by witnesses testifying in behalf of the defendant.
"* * * The fact that these parties held themselves out as husband and wife was established by the testimony of more than twenty-five witnesses. As a matter of fact, the defendant himself, while he denied that he ever introduced the plaintiff as his wife or as Mrs. Chaachou, testified as follows:
"`When somebody referred to her as Mrs. Chaachou I just ignored the whole thing. I don't want to embarrass her.' (Tr. 1437).
"And again at page 1597 of the Transcript the following question and answer appears:
"`Q. (By Mr. Pallot) Do you know whether or not her having introduced you as Mr. Chaachou to some of her friends gave them the impression that she was introducing you as her husband? A. Oh, sure, because always we were together without introduction everybody used to think she was my wife regardless of whether she was introduced or not.'
"It, therefore, conclusively appears, and the Master so finds that the public in general believed these parties to be husband and wife, and the plaintiff, as well as the defendant, deliberately conducted themselves in such a manner as to cause the general public to believe and think they were husband and wife.
"This brings us right down to the simple question of whether or not these parties intended, in good faith, to take one another as husband and wife as contended by the plaintiff. * * *
"* * * If we could rely upon repute and reputation alone for the establishment of the marriage, in the instant case, there is no doubt in the mind of the Master that such a marriage was established between the plaintiff and the defendant. However, the testimony of the plaintiff and certain written instruments, admittedly signed by her, are a part of the record in this case and must be considered before a determination of the question can be made. Neither cohabitation and repute nor circumstances, whose sole function is to show mutual consent of the parties, establishes a common-law marriage of itself, for to constitute the marriage relations de praesenti the parties must contemplate that the relation is being created at the present time when the contract is being made. Chaves v. Chaves, 79 Fla. 602, 84 So. 672."
In considering the existence of a common law marriage it is not only proper to consider repute but also to consider corroborative testimony as to whether or not a common law marriage came into existence or whether or not, as bearing upon the testimony of one of the parties, that they presently agreed to be married and to become husband and wife. If the husband desired to get rid of the wife without a divorce or waiting for death, he would naturally deny the existence of the common law marriage or the agreement. In such a case corroborative testimony, in addition to that of habit and repute, may become very material.
From examination of the record, we find, in addition to habit and repute, much corroboration in the evidence to sustain the testimony of the petitioner as to material facts relating to the actual existence and consummation of the common law marriage.
Other witnesses besides the petitioner testified that the respondent arrived in December, 1944, at Miami, and that petitioner met him at the railroad station and drove him to inspect a hotel which he had bought and then to 5041 Collins Avenue, where they spent the night together. The morning after the alleged common law marriage took place, there is other evidence, besides that of the petitioner, that *836 the parties went into the Savoy Plaza Hotel arm-in-arm and the petitioner, in the presence of the respondent, announced that they had been married. The respondent did not at that time deny this statement.
Early in January, 1945 the parties entertained some fifteen to twenty guests at the home at 5041 Collins Avenue where they were living together and at that time a toast to the newly-weds was made and on this occasion many guests brought wedding gifts or presents. It was described by one witness as the "wedding supper".
Later in January, 1945, after the wedding supper had taken place, there was a luncheon party with about fifty people present, including the respondent, and he was introduced as the husband of the petitioner. Some wedding presents were brought on this occasion also.
Many witnesses testified that prior to December, 1944 they had known the petitioner as Mrs. Phillips and after December, 1944, they knew her as Mrs. Chaachou.
The petitioner resided in Apartment 322 of the Savoy Plaza Hotel until December, 1944 and after the time of the alleged marriage, she moved to the home at 5041 Collins Avenue. Many social affairs were held by the parties at the home on Collins Avenue and also at the Savoy Plaza Hotel and also many religious services were attended by them together and at these places, they were known and accepted as husband and wife and were publicly introduced as such without any protest or denial from the respondent.
After the alleged marriage ceremony there was a contribution to Emergency Relief Fund and published in the Armenian General Benevolent Union which listed a thousand-dollar contribution of Mr. and Mrs. K. Chaachou. There were Christmas cards introduced in evidence addressed to Mr. and Mrs. K. Chaachou at Miami Beach and some mail addressed to them jointly.
Shortly after the alleged marriage the parties purchased a lady's diamond ring, valued at $5,000, and a lady's wedding ring of the approximate value of $500, and they were worn by the petitioner during the time she and the respondent lived and cohabited together.
In Lambrose v. Topham, Fla., 55 So.2d 557, this Court held that a prima facie case of a common law marriage had been established and that the burden then shifted and that the Court below applied the wrong rule in holding that there was no common law marriage. See also Spinella v. Spinella, Fla., 57 So.2d 588. In Lambrose v. Topham, supra, we said [55 So.2d 557]:
"Sufficient uncontradicted testimony showed a present, mutual agreement on the part of the deceased and the appellant to be husband and wife, and further shows subsequent cohabitation and reputation as man and wife in the community of the residence of the parties, and the testimony offered by the appellees in proof of their claim of the illegality of the marriage was not sufficient to meet the burden cast upon them.
"The County Judge applied an erroneous rule of law with reference to the burden of proof and the Circuit Judge committed error in affirming the order of the County Judge. The case is reversed with the directions that the courts below take further proceedings in accordance with this opinion."
The testimony offered by the petitioner in this case as to repute and reputation after the date of the alleged common law marriage, as found by the Master, established the fact "that plaintiff and defendant held themselves out as husband and wife to their friends, acquaintances and the general public, and for that matter, to the world, during this five-year period of time". Much of this testimony went further than to establish reputation and repute and was actually corroboration of testimony offered by the petitioner with reference to a marriage agreement. Much of the testimony was in actual corroboration of the testimony offered by the petitioner *837 that such an agreement had taken place. In going into the hotel the day after the alleged common law marriage and stating to employees that they had been married the night before, all in the presence of the respondent and undenied by him, the wedding supper and luncheon where they were introduced as husband and wife, without any denial on the part of the respondent, was actual corroboration of the testimony of the petitioner that a marriage agreement had been entered into. As a matter of fact, the Master found it to be the simple truth "that the plaintiff and defendant entered into this arrangement" and then he limited his finding by saying "for two purposes; first, mere convenience, and, second, business reasons."
In this case an agreement or arrangement constituting all of the essentials of a common law marriage was alleged by the petitioner. It was denied by the respondent. The highest and best evidence would be that of the contracting parties or those who were present at the time. Only two people are alleged to have been present. The respondent denies the contract, which makes corroborative evidence more material in this case. In 70 C.J. Witnesses, p. 789, Sec. 982, the author states that corroborative evidence is admissible to support the testimony of a witness who has been impeached, and also to corroborate unimpeached witnesses as to any fact in issue in the case. In Sec. 1368, p. 1180, of the same article, the author states that it is permissible to strengthen a witness' testimony by evidence of matters showing its consistency and reasonableness and tending to indicate that the facts probably were as stated by the witness. In Sec. 1372, p. 1187, of the same article, it is stated:
"The effect of corroboration in restoring the credit of an impeached witness depends on the nature as well as the extent of the corroboration. If a witness is corroborated his testimony should not be rejected, even though there are circumstances which would warrant the jury in discrediting his uncorroborated testimony; and corroboration of a witness on one point may render his testimony more credible on points as to which he is not corroborated. Where evidence of one witness is corroborated as against the uncorroborated statements of another, the uncorroborated testimony is held to be false or unconsciously erroneous and not entitled to credence; * * *." (Emphasis supplied.)
See also Streader v. Streader, 18 N.J. Super. 433, 87 A.2d 338; Gerard v. Gerard, 216 Minn. 543, 13 N.W.2d 606.
In the case of Amite Bank & Trust Co. v. Standard Box & Veneer Co., 177 La. 954, 149 So. 532, 536, it is stated:
"* * * That is the rule, but where documentary evidence corroborates the statements of one witness as against the uncorroborated statements of another, the uncorroborated testimony is held to be false or unconsciously erroneous. * * *"
The summary of the evidence heretofore given as to the actual marriage, the corroborating evidence with reference thereto, cohabitation and repute, shows beyond question, prima facie, a common law marriage, which shifted the burden to the respondent. He has not met the burden placed upon him by law.
Notwithstanding the evidence and the findings and conclusions of the Master based thereon, the report of the Master also contains the following:
"The Master now finds that the plaintiff has failed to establish the existence of a contract of marriage between the plaintiff and defendant."
This statement is inconsistent with his prior findings of fact and is a misapplication of the law on the subject.
The Master cites many theories to support this finding that the petitioner had failed to establish the existence of the contract of marriage.
*838 Petitioner continued to use the name of Phillips on many occasions and to sign many documents as Phillips. There is nothing unusual about a business woman continuing to use her former name after she becomes married. Certainly this fact, even in connection with other theories, is not sufficient to overcome a prima facie case of a common law marriage in view of the activities of the parties as shown by the record in this case.
The above quoted conclusion of the Master is evidently based upon the following statement found in his report:
"In this case, it is the simple truth, in the opinion of the Master, that the plaintiff and defendant entered into this arrangement for two purposes; first, mere convenience, and, second, business reasons.
"In so doing they perpetrated a fraud on many of their friends, acquaintances and the public in general. While it may be true, as contended by the defendant, that he permitted the plaintiff to use his name to save her from embarrassment. The plaintiff and defendant also knew that their hotel business would suffer if the public thought they were living together without being married." (Emphasis supplied.)
If marriage for convenience and business reasons is sufficient to hold the agreement illegal, it might be hard to sustain the legality of countless thousands of marriages. Many marriages have been consummated in order to join together estates or fortunes, or to preserve them from outsiders. Kings and queens have been known to marry off princes and princesses to those of royal blood in order to preserve or unite kingdoms and empires. Marriage contracts have been entered into for the specific purpose of saving embarrassments, or for business reasons, or for reasons of respectability to give legal parenthood to an expectant child.
It matters not whether the arrangement or the contract or the marriage was for a "mere convenience" or "business reasons" if the marriage was once established, it remains established until dissolved by death or divorce.
After the first order of reference and before there was any report from the Master, the Chancellor referred to the Master another matter having a bearing upon the main question. It appears that the respondent had written certain letters to members of the Legislature in 1953 and to the late Governor McCarty. Respondent was attempting to get through the Legislature a law abolishing, or making illegal, common law marriages. The letters were filed in evidence. In a letter to Senator Wayne Ripley, respondent stated:
"When I meet with such treachery, I become like a roaring lion, who, when he encounters the different beasts, doesn't give up until he crushes them even at the risk of his own life."
In a letter to Governor McCarty the respondent stated:
"My investigations show that there are innumerable cases of fraud already consummated, thousands more on the dockets and many more in the process of formation.
"It is almost impossible to believe that there are people who will allow themselves to turn an ungodly situation, with the help of unscrupulous lawyers and false witnesses into a three ring circus, in order to obtain money through blackmail."
In addition to the letters the Master took testimony with reference to the activities of the respondent and his charges of blackmail and found that there was not one scintilla of evidence to substantiate the charges of blackmail made by the respondent as to the petitioner or her attorneys, and that there "is no truth in the charges, and the same are false."
It was insisted by the petitioner that even though the charges of blackmail against her or her attorneys were found *839 to be false, the letters reveal the domineering, dictatorial and "rule or ruin" attitude on the part of the respondent and that he will go to any length, irrespective of truth, in order to accomplish his purpose. The petitioner contends that on some occasions when she signed papers or used her old name of Phillips, she did so at the direction and dictation of the respondent and in addition to the blackmail charge, she insists that these letters should be considered in corroboration of her contention of the dictatorial and domineering character of respondent.
The Master answers this by saying the law if enacted by the Legislature in 1953 could have been of no value to the respondent in changing his marital status which may have come into being in December of 1944. It is very true that such a law, if passed in 1953, could not change the marital status which came into existence in 1944, but there is nothing in the record to show that the respondent knew this. To say the least, his activities and his letters were for some purpose and it is reasonable to assume that he was under the impression or thought that the passing of such a law would be of some assistance to him in the pending litigation.
Whether or not the relationship which existed between the parties was meretricious prior to December, 1944 is immaterial in this case. Even if it was meretricious, there is no dispute between the parties that at the time of the alleged common law marriage neither party had any disability to marriage. The Master found that as the parties had capacity to marry at the time of the alleged common law marriage and as the words spoken were sufficient to constitute present assent, per verba de praesenti, such would constitute a legal contract of marriage between the parties. The contract of marriage was denied by the respondent. His denial made it necessary to establish a prima facie case of common law marriage. This was done not only by the words spoken but, as testified to by petitioner, by general repute and reputation, testified to by a score of witnesses, and other facts appearing in the record. If the relationship of the parties was meretricious to begin with, in December of 1944 it blossomed into a common law marriage and continued to be such common law marriage thereafter. Le Blanc v. Yawn, 99 Fla. 328, 126 So. 789; In re Thompson's Estate, 145 Fla. 42, 199 So. 352; O'Connell v. O'Connell, Fla., 45 So.2d 882.
In Le Blanc v. Yawn, supra [99 Fla. 328, 126 So. 790], this Court, speaking through the then Chief Justice Terrell, said:
"* * * although Samuel W. Le Blanc had a living wife at the time he commenced to cohabit with Mattie Jacobs Le Blanc, said union was dissolved, and he lived with said Mattie Jacobs Le Blanc for six or seven years thereafter; that they ran a laundry in Tallahassee, where both worked, and the employees understood that they were husband and wife; that they represented themselves to be such; and that they made no effort whatever to conceal this relation or represent themselves to be other than husband and wife. There was little or no evidence offered by the defense that could be said to positively contradict any of the foregoing facts. Under the rule as here announced we think the presumption of marriage was amply supported. "No rule of law is better settled than that which requires that he who asserts the illegality of a marriage must assume the burden of proving his assertion. * * *"
The respondent places great stress upon the case of McClish v. Rankin, 153 Fla. 324, 14 So.2d 714. The facts in that case are entirely different from the facts in this case, and the opinion is not applicable here.
The findings of fact and conclusions of law and the recommendations of the Master were "approved, confirmed and ratified" by the Chancellor, and the prayers for divorce, temporary counsel fees, temporary alimony and temporary suit money were denied. This order of approval *840 was of the report of the Master appointed for the sole and only purpose of taking the testimony of the parties upon the issues of temporary alimony, suit money and counsel fees and filing his recommendations with reference thereto.
The findings of fact of the Master and his report in connection with such findings of fact were wholly inconsistent with the conclusion of the Master reading as follows:
"The Master now finds that the plaintiff has failed to establish the existence of a contract of marriage between the plaintiff and defendant."
It is quite evident from the report of the Master that he did not place the burden of proving the illegality of the common law marriage upon the respondent, that his conclusions were inconsistent with his findings of fact, and that he applied the wrong rules of law in arriving at his final conclusion last above stated. In his order ratifying, affirming and approving the report of the Special Master, and in holding that based upon the Special Master's Report, the plaintiff and the defendant "are not now, nor ever were, husband and wife", the Chancellor committed error.
A common law marriage was sufficiently established to warrant alimony, suit money and attorneys' fees pendente lite.
The record shows that the petitioner is penniless and is dependent upon the charity of her friends and that the respondent is an active businessman and that his worth far exceeds one million dollars.
An attorneys' fee for the services of petitioner's attorneys in this Court be and the same is hereby fixed at the sum of $5,000, and the respondent, Khudourie Chaachou, be and he is hereby ordered to pay the same. All costs for prosecuting this appeal, including the cost of the transcript of record, and excepting only the deposit of twelve dollars for costs filed with the Clerk of this Court, be and the same are hereby assessed against the respondent, Khudourie Chaachou, and the sum total of such costs shall be fixed and determined by the Chancellor.
The Chancellor should make an award for alimony, suit money and attorneys' fees pendente lite in the Court below from the time of the filing of the suit and assess the same against the respondent, Khudourie Chaachou.
The petition for certiorari be and the same is hereby granted. The interlocutory order of the Circuit Court of the Eleventh Judicial Circuit, in and for Dade County, Florida, denying the petitioner alimony, suit money and attorneys' fees pendente lite should be and the same is hereby quashed for further proceedings in accordance with this opinion.
ROBERTS, C.J., and TERRELL and SEBRING, JJ., concur