### CHAACHOU v. CHAACHOU, et al.

Circuit Court, Dade County.

July 17, 1957.

Brigham, Black, Niles & Wright and James Pilafian, all of Miami, for plaintiff.

Cypen, Salmon & Cypen, Miami Beach, for defendants.

ROBERT H. ANDERSON, Circuit Judge.

On July 11, 1952, Fredericka Philips Chaachou filed her complaint against Khudourie Chaachou, et al, for a divorce, alimony, etc. The cause of action was based upon an alleged common law marriage. The defendant denied the common law marriage. The circuit judge in whose division the case fell referred it to a master who took more than 2,000 pages of testimony and received in excess of 100 exhibits. He found that no common law marriage existed. The circuit judge approved, confirmed, and ratified the master's report.

The Supreme Court granted a petition for certiorari, quashed the order of the circuit judge, and sent the case back to this court for further proceedings in accordance with the opinion. Chaachou v. Chaachou (1954), 73 So. 2d 830. When the case came back it was assigned to this division (K). A motion was made by the plaintiff to declare conclusively that the parties were legally husband and wife. The court took the view that the Supreme Court had held that the plaintiff had established a prima facie case, that both sides had announced that they had no further testimony to offer and had rested, and that the time for taking testimony had expired. The court, therefore, granted the motion. In this it appears that the court was in error, as its order was quashed in certiorari proceedings and it was directed "to consider the testimony which heretofore was taken before the special master as establishing, prima facie, the existence of a common law marriage, and permit either party to this cause to present further evidence if he or she so desires." Chaachou v. Chaachou (1957), 92 So. 2d 414.

In compliance with these directions from the Supreme Court, this court conducted hearings on twelve days that totaled more than forty hours. Thirteen hundred additional pages of testimony were taken, thirty witnesses were seen and heard in person by the court, in addition to which five depositions (two by the plaintiff and three by the defendant) were read, and thirty exhibits were offered and received in evidence. The court cannot refrain from making the observation that this case has been a most frightful and inexcusable waste of the court's time. Hours and hours have been spent listening to the witnesses, reams of paper have been consumed in transcribing their testimony, and thousands of dollars have been spent for witness fees and expenses, court reporters, and lawyer's fees. The only excuse for it that the court knows is that the parties have money. This would not seem to justify it.

The court feels that it was enjoined by the Supreme Court not to go back and consider the testimony previously taken before the master which was held to establish prima facie the common law

marriage alleged in the complaint. If the court is correct about this, it cannot consider the documentary evidence that was offered at the master's hearings, which the defendant fervently urged it to do. Much of the defendant's documentary evidence at these hearings consisted of checks, corporate resolutions and the like, in the execution of which she used the name "Philips." The Supreme Court dealt with this as follows—

"Petitioner continued to use the name of Phillips on many occasions and to sign many documents as Phillips. There is nothing unusual about a business woman continuing to use her former name after she becomes married. Certainly this fact, even in connection with other theories, is not sufficient to overcome a prima facie case of a common law marriage in view of the activities of the parties as shown by the record in this case." 73 So. 2d 838.

The court has, therefore, taken the position that all of the testimony and evidence, including exhibits taken and received by the master, prima facie establish a common law marriage and cannot be reconsidered. This does not mean to say that such evidence may not be rebutted, because that is the object of this proceeding. But it does mean to say that the Supreme Court of Florida has considered all the evidence taken before the master and holds that, in toto, it makes out a prima facie case of common law marriage.

The Supreme Court, in holding that a common law marriage was prima facie established, said—

"In considering the existence of a common law marriage it is not only proper to consider repute but also to consider corroborative testimony as to whether or not a common law marriage came into existence or whether or not, as bearing upon the testimony of one of the parties, that they presently agreed to be married and to become husband and wife. If the husband desired to get rid of the wife without a divorce or waiting for death, he would naturally deny the existence of the common law marriage or the agreement. In such a case corroborative testimony, in addition to that of habit and repute, may become very material." 73 So. 2d 835.

And further—

"In this case an agreement or arrangement constituting all of the essentials of a common law marriage was alleged by the petitioner. It was denied by the respondent. The highest and best evidence would be that of the contracting parties or those who were present at the time. Only two people are alleged to

have been present. The respondent denies the contract, which makes corroborative evidence more material in this case." 73 So. 2d 837.

In these circumstances there is little that the court can do except to find that the defendant has not carried the burden of overcoming the prima facie showing of a common law marriage. The defendant put on twenty-six witnesses; the plaintiff, nine (including depositions). There is no such thing as reconciling their testimony. If the issue were to be decided by the sheer numerical weight of testimony, the defendant would prevail, but that, of course, is not the rule. The court heard each of the defendant's witnesses (three by deposition) and is of the opinion that their testimony is not of such weight and credibility as to overcome the prima facie case held by the Supreme Court to have been established before the master. In addition to this, there are certain features of the defendant's testimony that might bear mentioning. For instance, Mr. and Mrs. Bayne both testified by deposition that they attended the wedding of the plaintiff's daughter in 1951 in Miami and the plaintiff introduced them to a Mr. Philips as follows—"I want you to meet my husband, Mr. Philips."

Now there are several remarkable things about this testimony. The first is that Mr. and Mrs. Bayne, six years after an event took place, used exactly the same language in describing it, i.e., "I want you to meet my husband, Mr. Philips." The second remarkable thing about this testimony is that without any dispute the plaintiff had been divorced from her former husband in September 1944, seven years before the alleged introduction took place. The third remarkable thing about the testimony is that her former husband was never named "Mr. Philips"—a name that both witnesses used. His name was Philibosian. She took the name of Philips when she got her divorce from him. He continued to be known as Philibosian. These things brand the testimony of the Baynes as wholly unworthy of belief.

Now, we come to Mrs. Sigman who testified that she had sworn falsely in her previous testimony in behalf of the plaintiff. She said that the plaintiff rode with her in a car to the courthouse on the prior occasion when she testified and told her what to say, which she did. The plaintiff's attorney made the statement to the court that Mrs. Sigman's testimony on the prior occasion was in exact accordance with a conference that he had with her in his office a few days prior thereto so that her story about the conversation with the plaintiff in the car en route to the courthouse could not be true. The kindest thing that can be said about this lady is that she

was confined in a mental institution in Georgia on two or three occasions and perhaps has not fully recovered.

Of the twenty-six witnesses produced by the defendant, Joseph Cohen, Reverend Price, William Wertheimer, Mathilda Jamgochian, Isidore Sinkowitz, Haig Bartanian, Fernando De Macedo, Morris Wachholder, Albert Bayne, Mrs. Bayne, Mary Jones Sigman, and the defendant himself, had called or had heard the plaintiff called "Mrs. Chaachou." The defendant repeated, almost verbatim, his testimony quoted by the Supreme Court—"When somebody referred to her as Mrs. Chaachou I just ignored the whole thing. I don't want to embarrass her." 73 So. 2d 835. Where there is all that smoke there must be some fire.

A favorite theme of the defendant's witnesses was that the plaintiff, while attending the Avak meetings at the Savoy Plaza, would say that she was glad she was a single woman so she could give her money to the Lord. Apart and aside from the fact that this on its face seems a rather unusual thing for a person to do in the circumstances, six of the defendant's witnesses who attended these services never heard any such statement. Of course, that isn't conclusive, but it casts some doubt on the reliability of the statements of the witnesses who claimed that they heard it.

As against this evidence, the plaintiff's testimony is the more convincing. Mary Kulhahjian is a winter resident. Her husband has a resort hotel in Asbury Park, New Jersey. She met the plaintiff in 1942 when she was Mrs. Philibosian. She now knows her as Mrs. Chaachou. When she was informed that the parties had married she sent them a wedding gift and attended a wedding party at the Chaachou home at 5041 Collins Avenue.

Louis S. Iliad is not an Armenian, but a Greek. He lives in Norfolk, Virginia, and is retired. He met the plaintiff in 1922 and met Chaachou in 1945 at his home on Collins Avenue at a dinner. He and his wife and his sister were introduced by the plaintiff to Chaachou as her husband. He also identified a photograph in which he and Chaachou appeared (exhibit 2-2). Mr. Iliad was a most impressive witness.

Mrs. Mary Kupelian, of Akron, Ohio, is a former social worker. She is a Greek and has known the plaintiff since 1909. She taught her in Turkey. She came to the United States in the 1920's, and now and since 1945 has known the plaintiff as Mrs. Chaachou.

Kenneth Korkoian is an electrician. He met Chaachou at the Coral Reef Hotel in 1946. He met the plaintiff the same day and

Chaachou introduced her to him as "Mrs. Chaachou." He worked for Chaachou at the Savoy Plaza and the Somerset Hotel and at the home where he lived with Mrs. Chaachou. He had dinner with them on their wedding anniversary.

Mrs. Betty Hamilton is a waitress at the El Comodoro Hotel. She never knew the plaintiff by any name other than Chaachou. The plaintiff introduced herself at the Avak meetings as Mrs. Chaachou.

Valentine and Leo Kalayjian met the plaintiff at the Peter Pan Lodge owned by the defendant in Tannerville, New York. She introduced herself as Mrs. Chaachou and introduced the defendant as her husband.

Mrs. Juanita James said that Chaachou called her on the telephone on the night of June 17, 1957, and talked to her for an hour from 9 to 10 P.M. In the course of that conversation he told her that several of the witnesses had "come over to him and changed their testimony" and asked her if she didn't want to change hers— if her conscience didn't hurt her. She replied that it did not. Chaachou did not, in substance, deny this testimony.

The court feels that, if anything, the plaintiff has the better of the case, but in any event feels safe in saying the defendant has not overcome the burden of the prima facie case that the Supreme Court held to have been made at the hearings before the master.

It is therefore, ordered, adjudged and decreed that a common law marriage has been established conclusively between Fredericka Philips Chaachou and Kjudourie Chaachou and they are held to be husband and wife.