HOWELL, CHARLES COOK, Jr., Associate Judge.
Raymond C. Dykes was on trial before the court sitting without a jury, for the alleged robbery of Louis Estes.
After Estes had testified that prior to the actual extraction of the money Dykes “started hitting me . . . and the other man (accompanying Dykes) was holding me. and both of them started pummelling me. They had me on the ground” — and that immediately following the taking of the money Dykes “started kicking and beating me. My eyes were closed and my nose was busted and I was choking up blood in the car”,[1] the State produced certain photographs which the Assistant State Attorney requested the Clerk to mark as the State’s evidentiary exhibits. Whereupon defense counsel objected “to the entry of the photographs ... as not being properly admissible.”
The record then reflects the following:
“The Court: All right. Hand the photographs to the witness.

“The Court: Sir (of Estes), have you looked at the photographs ?
“The Witness: Yes, sir.
“The Court: Do they truly and accurately depict your condition at the time the photographs were taken ?
“The Witness: Yes, Your Honor.
“The Court: When were they taken?
“The Witness: They were taken from my mother’s house after I left the hospital . . On the same morning of August IS (the date of the robbery), because the Police Department had called Baptist Hospital.
“The Court: Do not tell us what other people said. But they truly and accurately depict your condition; is that correct?
“The Witness: Yes, sir.
“The Court: They will be admitted.”
Dykes says, by assignment of error, that in the above respects “the Court erred in taking a participating part in the interrogation of witnesses”; and the first point argued in his appeal from an adjudication by the court of guilt of the crime of robbery as charged, and the imposition of a sentence of one year’s confinement at hard labor in the state penitentiary, is that the foregoing “questioning of the appellee’s only witness by the trial judge exceeded the bounds of neutrality and impartiality inherent of (sic) his position so that the appellant was not given a fair trial.”
Not only was there no jury to be extraneously influenced by undue solicitude for the actions and opinions, as best they could fathom them, of the judge trying the case.
This judge asked but four significant questions of Estes. Following them, Dykes’ own counsel asked three more questions clarifying the time the pictures were taken.
Thus it is that, as in Watson v. State, Fla., 1966, 190 So.2d 161, 164, “we do not find that the trial judge exceeded his duty or passed beyond the pale of neutrality or impartiality. None of the questions or comments appear to us to contain the taint of bias or prejudice.” Watson accords *67 considerable power to “a trial judge, in order to ascertain the truth, . . .” Crews v. Warren, Fla.App. 1, 1963, 157 So.2d 553, 561, remarks that “to that end a trial judge must be and he is vested with the duty and broad power to do those things reasonably necessary to insure the integrity of the trial over which he presides .and to make such inquiry as may lead to the truth or a better understanding of it.”
It is difficult to see how this trial judge prejudiced[2] himself by his just related conduct. On the contrary, the record discloses that upon one occasion the judge assisted the defense in properly phrasing a question to a witness concerning the “general reputation in the community in which (the defendant) resides for truth and veracity.” Again on behalf of the defendant the court, in a series of seven questions, developed from yet another witness that Dykes had a good general reputation for truth and veracity — and promptly denied the state’s objection and motion to strike that testimony.
Dykes, however, feels twice aggrieved.
Also assigning as error “that the judgment (is) contrary to the weight of the evidence” and “that the state failed to sufficiently contradict the testimony of the defendant,” he contends in his brief on this facet of his attacks that he “was so intoxicated at the time the offense is alleged to have occurred that he could not possibly have been capable of forming the animus furandi.”
Has he perchance overlooked Woods v. State, 1943, 152 Fla. 417, 12 So.2d 111, 112? “Whether or not the appellant was so intoxicated as not to be capable of forming the intent necessary to his conviction was a jury question. The record convinces us that the jury reached the proper and legal conclusion.” [3]
True, no witness corroborated Mr. Estes. Yet subsequent to Chaachou v. Chaachou et al., Fla., 1954, 73 So.2d 830, 837, upon which Mr. Dykes relies, the Supreme Court, in State v. Sebastian, Fla., 1965, 171 So.2d 893, 895, declared that “we know of no statute or case law in this jurisdiction which requires more than one witness in a criminal case nor do we believe it proper for an appellate court to reverse a conviction of guilt upon the basis of insufficiency of the State’s evidence merely because the State produced but one witness and his testimony was contradicted by the defendant.” Much earlier the Supreme Court, in Heitman v. Davis, 1937, 127 Fla. 1, 172 So. 705, 706, had allied itself with the rule that “evidence . . . which comes from one *68 witness may preponderate over contradictory evidence given by half a dozen witnesses.”
In short: As the trial judge said when overruling the Assistant State Attorney’s objection to defense counsel’s closing argument, “it is closing argument and I listen as I would instruct the jury, that that which I want to believe, I believe, and I would disregard that which I do not want to believe [4] — the same I would instruct any juror.”
The judgment of conviction is consequently right.
It is affirmed.

. Probably placing Estes in a far different frame of mind from that enjoyed by the victim envisioned by Shakespeare in Act V of his Othello: “The robb’d that smiles, steals something from the thief!”

. Crews says that “the act complained of must be such as to produce a compelling inference” that prejudice was present!

. The Woods record “shows conclusively that Wood with two companions went in the nighttime to the home of the victim ; . . . that they entered the house, assaulted the old man and that one of the party took him money, which was in a pocketbook under a pillow on his bed, and that they all left the house together, leaving the old man in a bruised and beaten condition. They ran away from the house and separated. The man who took the money was never apprehended . . This, however, does not relieve the appellant of responsibility for his part in the robbery.”
Our current record shows startlingly similar facts indicative of a mind not so befogged with alcohol as to prevent Dykes from forming an intent to rob. Dykes also went “with two” other men “in the nighttime to the home of the victim.” It was Dykes himself who opened Estes’ front door and chided Estes concerning the malfunctioning of the station wagon’s motor upon which Estes had presumably worked. It was Dykes who “shoved me in the back seat”; Dykes it was who drove; Dykes it was who beat and abused Estes and, as in Woods, left him “in a bruised and beaten condition.” And while (once more as in Woods) it was not Dykes who personally “took the money”, it was Dykes who told his accomplice, “You take the money and then you give it to me”- — and followed with the comforting thought, “Well, I got a good mind to throw you in the canal and let the gators get you.”

. “Where there are conflicts in the evidence in a non-jury trial, it is within the province of the trial judge to reject any testimony he finds to be untrue and to accept and rely upon that which he finds to be worthy of belief.” Hoover v. State, Fla.App. 3, 1968, 212 So.2d 95, 96.
Indeed; the evidence in just about all trials, like the fame of which John Milton spoke in his Samson Agonistes, “with contrary blast proclaims most deeds!”