67 So.2d 203 (1953)
LONGINO
v.
LONGINO.
Supreme Court of Florida, Division A.
July 21, 1953.
Rehearing Denied September 22, 1953.
Clyde H. Wilson, Sarasota, for appellant.
Dewey A. Dye and Dye & Dye, Bradenton, for appellee.
TERRELL, Justice.
Appellee sued appellant for divorce, alleging as grounds therefor, extreme cruelty and frequent indulgence in a violent and *204 ungovernable temper. An answer, to which was attached a counterclaim, denied the material allegations of the bill and claimed alimony unconnected with divorce, or, if divorce be granted, permanent alimony and a special equity in the husband's property. Testimony was taken and on final hearing the plaintiff's prayer for divorce was granted, alimony, temporary or permanent, and equity in the husband's property was denied, but the wife was granted a one-half interest in a $3,300 mortgage. This appeal was prosecuted by the wife.
There are only two questions necessary to consider, (1) Did the plaintiff prove extreme cruelty and frequent indulgence in a violent and ungovernable temper? (2) Under the circumstances, should the wife have been denied alimony and a special equity in the husband's property, the value to which is said to have increased materially during the period of coverture.
As to the charge of extreme cruelty and habitual indulgence in a violent and ungovernable temper, the bill alleges that appellant commenced generating matrimonial tempests as soon as the honeymoon was over. The bill of complaint required all the letters in the alphabet to invoice and classify the different tempests she set in motion. They were as numerous as the ills that escaped from Pandora's box, not even "Hope" remained, so found the chancellor. The matrimonial tempests grew more frequent and appear to have gathered momentum with the months. The plaintiff fended and feinted for little more than a year, then vamoosed from the home and brought this suit for divorce.
While we do not detail a complete list, the categories of habitual indulgence in a violent and ungovernable temper included nagging, fussing, quarreling, bawling plaintiff out and abusing him in the presence of friends and relatives. They also included a charge of inflating his income tax return, charges of immoral conduct for which there was no basis in fact, calling him a crook and a liar, insulting plaintiff's friends and children by a former marriage, when they came to the home. She repeatedly told plaintiff in the presence of his friends that he was a cheat, crook and a skunk, that he was selfish and stingy and would not keep up the house. She further charged that plaintiff's children were two-faced and that she did not want the grandchildren in the home. She charged complainant with promiscuously kissing other women in public places, she broke up old and long established friendships; that to indulge these and other samples of her spleen the days were found to be too short, so she would frequently rise up in the nighttime and harass and annoy the plaintiff with them, that her conduct in this was so frequent, persistent, bitter, and acrimonious, that it broke the plaintiff's health and not only forced him to vacate his home, where he had lived for many years, but the only refuge left him was in the wisdom of Solomon which he adopted and has found it much "better to dwell in the corner of the housetop than with a brawling woman in a wide house."
The evidence has been examined and while there are some conflicts or contradictions, the decided preponderance of it reveals that there was no basis for defendant's charges against the plaintiff, that her attitude to the marital relation was in no sense that of a helpmate, a mature, well adjusted woman, but that it was infantile in the extreme. It was perhaps the product of what some of the family relations clinics choose to call "infantile romanticism." There is ample evidence to support the chancellor's decree, while it is shown, and the chancellor found, that she lured him into the matrimonial trap, it is also shown that he deliberately ran over two red lights to get snared; (his ex fiancee having been two times previously married and divorced) and he now desires to hang up a third red light to warn the next prospective victim. It may be that "love is blind" or shall we say colorblind? There was no plea setting up that defense.
Appellant's main defense to this point is that complainant is in a court of equity, that she refused to sign plaintiff's income tax return because it was fraudulent in that *205 his item of church contributions was greatly inflated. Evidence was taken on this charge and all it shows is two contributions of $110 and $135 to his own church, but it is silent as to contributions to the Salvation Army, the Gideons and other religious causes. Even if the charge had been sustained, we do not see that it had little, if any, relation to this case. There was ample evidence to support the decree of divorce on other charges.
On the question of whether or not appellant should have been granted alimony or some special equity in the husband's property, the chancellor found that she did not contribute financially, by her industry or in any other manner, to the acquisition of said property, that she was a discordant element in the home, that she contributed nothing to create an equity in her behalf, that the marital venture went on the rocks in a short time, that there were no children, in fact, they were both past the expectant age, and that the parties are living apart through appellant's fault. Since no ground for divorce was shown to exist in her favor, the chancellor concluded that she was entitled to nothing in the way of alimony. Equity is a two way street and he who invokes it must have a good measure of it on his side.
The special equity in the husband's property is predicated on the theory that he owned approximately a one-half interest in 11000 acres of land in Sarasota County which she says greatly increased in value during their coverture. Appellant was awarded nothing by the decree of divorce but $1,650 equity in a mortgage held by them as an estate by the entireties. The controlling statute is 65.08, F.S.A. It provides that no alimony be given an adulterous wife, which there was no suggestion of. Otherwise maintenance, alimony and suit money are controlled by circumstances of the parties and the discretion of the chancellor. It is shown that she got board and lodging for a year and a half, got her lawyer and the expense of this suit paid and acquired a $900 diamond at the outset. The chancellor evidently reasoned that this was pay enough for one who, as he said, was experimenting in the matrimonial pool. The statute is susceptible to that interpretation.
We are driven to the same conclusion so his judgment is affirmed.
Affirmed.
ROBERTS, C.J., MATHEWS, J., and HOLT, Associate Justice, concur.