135 So.2d 206 (1961)
Fredericka Phillips CHAACHOU, Appellant,
v.
Khudourie CHAACHOU; Paris Corp., a Florida corporation; Columbia Corp., a Florida corporation; and the K. Chaachou Foundation, a Non-Profit Florida corporation, Appellees.
No. 31164.
Supreme Court of Florida.
November 29, 1961.
Rehearing Denied December 11, 1961.
*207 James Pilafian and Brigham, Wright, Goodwin & Dence, Miami, for appellant.
Jackman & Benton and Ephraim Collins, Miami, for appellees.
PER CURIAM.
On this appeal we are confronted with the culmination of one of the most protracted and bitterly contested divorce proceedings in the annals of Florida jurisprudence.
We quote in full the findings of facts, the conclusions of law and the final decree of the chancellor which is under attack herein:
"By her Complaint filed July 11, 1952 alleging a common law marriage with the defendant, Khudourie Chaachou, plaintiff, Fredericka Phillips Chaachou, seeks divorce *208 on the ground of extreme cruelty, an award of alimony, suit money, counsel fees, and a decree for special equities in certain properties mentioned in the Complaint, which consists of four Miami Beach hotels and a residence at 5041 Collins Avenue, Miami Beach.
"The defendant, Khudourie Chaachou, and all corporate defendants on August 6, 1952, filed their joint Answer to the Complaint denying generally all its allegations including the alleged marriage, and admitted only that the defendant, Khudourie Chaachou, was born in Bagdad, Iraq, had become a naturalized American citizen, that he was engaged in the wholesale rug business in New York City, and that he was involved in the automobile accident which plaintiff alleged initiated her coming to Miami Beach and becoming both the defendant's wife and his business partner.
"On July 16, 1952, the cause was referred to a Special Master by Division A of this Court, before which this cause was then pending `for the purpose of taking testimony of the respective parties of this cause upon the issue of temporary alimony, temporary suit money and temporary counsel fees to be awarded to the plaintiff, and for the purpose of filing his recommendations to the Court both on the facts and the law with all convenient speed.' To aid the Master in reaching a conclusion on the purposes for which this cause was then referred to him, the parties produced forty-seven witnesses whose testimony appears on more than 2,000 legal size pages, and submitted to him eight written depositions and over 150 exhibits, more than 100 of which were received in evidence.
"In Chaachou v. Chaachou (Fla.Sup.Ct., Rehearing denied June 21, 1954) 73 So.2d 830, the Supreme Court of Florida found the Master to be in error (as was Division A of this Court confirming his report) when he recommended against the existence of a common law marriage between the parties. The Supreme Court held (73 So.2d 830, at p. 837):
"`The summary of the evidence heretofore given as to the actual marriage, the corroborating evidence with reference thereto, cohabitation and repute, shows beyond question, prima facie, a common law marriage, which shifted the burden to the respondent. He has not met the burden placed upon him by law.'
"On September 17, 1956, by order of the Senior Circuit Court Judge, this cause was transferred (due to the illness of the Judge presiding over Division A) to Division K (now Division H) `for permanent and final disposition.' Accordingly, the Judge of this Division of the Court has since such time been the Chancellor in this cause.
"Pursuant to the Mandate of the Supreme Court of Florida in Chaachou v. Chaachou (Rehearing denied February 19, 1957) 92 So.2d 414, directing that the parties be permitted to take further testimony on the issue of common law marriage, this Court entered its Order entitled `Order Conclusively Establishing Existence of Common Law Marriage Between Parties' on the 17th day of July, 1957. This order was entered after this Chancellor had seen and heard thirty witnesses testify (whose testimony covers 1,300 legal size pages), had read five depositions, and had inspected thirty exhibits marked in evidence. Before the entry of this order, this Chancellor had, in order to be familiar with the background of this case prior to its assignment to him, studied the record made before the Master, which was reviewed by the Supreme Court of Florida in Chaachou v. Chaachou, 73 So.2d 830. The defendant, Khudourie Chaachou, appealed the marriage order to the Supreme Court of Florida, which was affirmed in Chaachou v. Chaachou, 105 So.2d 793 (Rehearing denied October 7, 1958).
"On November 19, 1958, on motion of the plaintiff therefor, an order was entered appointing the Honorable George T. Clark (now Judge of the County Judge's Court of Dade County) Special Master in this *209 case `to take the evidence and testimony of the parties hereto on those issues of the Complaint of the plaintiff and the Answer of the defendants, which have not heretofore been determined by this Court.' The Master set the cause for final hearing on January 29, 1959, and thereafter there appeared from time to time a number of lawyers before the Court representing the defendant, Khudourie Chaachou, asking for a continuance of the Master's hearing that they might become familiar with the case in order to try it for the defendant. Repeated continuances were granted to accommodate the defendant, Khudourie Chaachou, and his lawyers from time to time. The last one so requesting a continuance (which was granted) was Mr. John E. McCarey, and he agreed to try the case before the Master on June 8, 1959, and to continue the trial without interruption until it was completed, and an order to that effect was entered.
"On June 1, 1959, additional new counsel for the defendants appeared before the Court and tendered an amendment by way of counterclaim to the defendants' Answer, which had been on file since August 14, 1952, and asked leave by their motion to file the same. This counterclaim charged the plaintiff with adultery and claimed that by virtue thereof she should not be granted any relief under her Complaint. No excuse was alleged for the delay of almost seven years in attempting to amend the Answer; and since it was apparent from the record of this cause that, if there was any foundation for the charge, it was known to the defendant as early as 1951, this Chancellor felt that the Motion for leave to amend the Answer by filing the counterclaim was not legally sufficient and entered an order denying the same.
"Upon appeal, Chaachou v. Chaachou (D.C.A. 3d Dist., Rehearing denied March 8, 1960) 118 So.2d 73, the Order of this Chancellor was reversed with directions to permit the counterclaim to be filed. Thereafter, upon plaintiff's motion that the Mandate of the Appellate Court be placed in effect, and that the cause be set for final hearing, it was ordered that the counterclaim be filed and that the cause be set for final hearing before this Chancellor on August 29, 30 and 31, 1960, Judge Clark having meanwhile been appointed to the bench.
"At the final hearing beginning on August 29, 1960, this Chancellor saw and heard the testimony of twenty witnesses, whose testimony covers 861 legal size pages; and in addition received and read nineteen exhibits, one of which (Plaintiff's Exhibit 3-8) consisted of twenty-one letters, all except two being written by the defendant, Khudourie Chaachou, to plaintiff's counsel. At the conclusion of the final hearing the parties filed extensive briefs advocating their positions. Midway during the final hearing of this cause Mr. John Carruthers II, who filed defendants' counterclaim of adultery, and who had represented the defendants in the last appellate proceeding in this cause, asked leave to be relieved of his representation, which was granted.
"During the course of this litigation, including interlocutory and final hearing, this Chancellor has seen and heard a total of forty-nine witnesses, whose testimony covers 3,161 legal size pages, and has received in evidence and read fifty exhibits, including five depositions. In order to properly evaluate the equities of this cause, the record made before the Master on the original reference, which record was initially before the Supreme Court of Florida in Chaachou v. Chaachou (Rehearing denied June 24, 1954) 73 So.2d 830, has been reviewed. This record consists of an excess of 2,000 pages of testimony, 100 filed exhibits, and eight depositions.
"From this massive record it appears, and is so found, that the equities of this cause are with the plaintiff, and she is entitled to the relief prayed for in her Complaint.
"Plaintiff bases her claim for divorce on the ground of the defendant Chaachou's extreme cruelty, and there is ample evidence to sustain this ground. The plaintiff *210 and the defendant Chaachou are both naturalized citizens, becoming such in 1950 and 1942 respectively. The plaintiff was born in Turkey of Armenian parents, and the defendant Chaachou was born in Bagdad, Iraq, of Jewish parents. The early history of their business acquaintanceship is recorded in Chaachou v. Chaachou, 73 So.2d 830, 832. It is apparent that plaintiff came to Miami Beach from Atlanta at defendant Chaachou's request in the Fall of 1942, and assumed the management of the Savoy Plaza Hotel which he had recently purchased for $165,000.00. Defendant Chaachou owned the Imperial Persian and Chinese Rug Company of New York City, which his counsel represented to the Court in this cause on September 12, 1952, was `probably the largest rug importing business in the United States.' On plaintiff's advice, after she began operating the Savoy Plaza Hotel, defendant Chaachou bought the Coral Reef, the Somerset, and the Astor hotels, also located in Miami Beach. Shortly after their purchase, these hotels were released by the military forces, which had been occupying them during the war, and the plaintiff took over their active management and operation also. According to the appraisal report of Adrian McCune, M.A.I., Plaintiff's Exhibit 3-1, these hotels are located near the southerly end of Miami Beach. They are not in the class with those more recently constructed further north along the ocean. But when they were acquired and for almost ten years thereafter, these hotels, because of plaintiff's good management and the scarcity of hotel accommodations at Miami Beach, enjoyed an extraordinary patronage and produced a large amount of revenue.
"That the plaintiff worked hard and effective in the operation and management of these hotels for almost ten years after they were acquired is beyond dispute. Defendant Chaachou testified:
"`A. Well, Fredericka was really my right hand. She was behind the desk; she was watching every hotel; she was a hostess, entertainer. She was on every occasion  really, she took my place. She had a free hand. Whatever she do or whatever she spend or whatever else she do  I think I was approximately more than busy man with four hotels on my hand and my importation and exportation in New York. I was hundred per cent practically depending on her, whatever she said goes, * * * she was really equipped for that business at that time.'
"When asked at the Master's hearing in what capacity plaintiff worked at the Savoy Plaza Hotel, which was the first one he bought, defendant Chaachou testified:
"`Capacity of everything  as a hostess, housekeeper, manager, taking care of everything  entertainer.'
"When questioned on his deposition, which was received in evidence before the Master, if he had used the plaintiff as intermediary in the transfer of funds, he testified:
"`A. I used the plaintiff as everything  in business and socially, as a hostess and so forth.'
"The plaintiff had been an interior decorator in Atlanta before she came to Miami Beach. Her description of what she did when she took over the management of the Savoy Plaza Hotel appears in her testimony, which is undisputed. She testified:
"`I did everything that the hotel can be operated. I used to decorate; I used to be on the desk; I used to rent rooms; I looked at them, and many other things I did. I ripped the hotel, put a new bar downstairs, opened a door from the beach, all of this operation, and redecorate the hotel.
"`When I came that hotel used to take $25 a month a room. I put everybody out. I redecorated the hotel. When I was operating, the hotel was getting $25, $18 a day.'
*211 "Plaintiff testified that she made substantial savings on her interior decoration of the hotels, testifying:
"`* * * I saved $10,000 or $15,000 or $20,000 a year from my decorating.
"`Q. During what year? A. All the time I had to decorate.
"`Q. Because you did the decorating? A. I saved a lot of money. Material that sells $25 a yard, I but $2.35.'
"While she was at their summer residence in Tannersville, New York in November, 1951, defendant Chaachou telephoned her to fly to Miami Beach and redecorate three of the four hotels in order to get them ready for the coming season. She did this, replacing the tile, repairing the furniture, hiring the carpenters, and doing whatever was necessary to get them ready.
"On cross-examination she testified:
"`Q. As a matter of fact during the last several years since Avak came to Miami Beach, you have been less and less active in the operation of the Savoy Plaza Hotel and other business owned by Mr. Chaachou, isn't that true? A. Sir, I was very active all the time.
"`Q. Even in the past few years? A. I worked so hard until this last month ago, sir, if you don't believe me, ask thousands of people.
* * * * * *
"`A. I used to go to the bank. I used to rent rooms during the season. I used to be as hostess. I used to redecorate. Every hotel needs redecorating, and put everything. And this year I was every day in the kitchen. I was in the dining room. Sometimes they need help in the dining room. Even 3:00 o'clock in the morning, A.M., I used to work sometimes with the help. I worked very hard.
"`Q. What hotel did you rent rooms in? A. Every hotel I have rent rooms, sir. I have rent rooms this year at Somerset. I have rent rooms in Savoy Plaza this year.
* * * * * *
"`* * * I was the key of everything in these hotels'
* * * * * *
"`* * * When everybody comes, they want room, they want Mr. Chaachou. I'm eating, or whatever, I go.'
* * * * * *
"`I work all them. If switchboard short, I go to the switchboard. Everything has to be done, I do it.'
* * * * * *
"`Sir, whatever my husband ask, I do, any time. It doesn't matter if midnight or nothing. It is our hotels, and for our profit. * * * If he orders me anything, I'm in it. I never say no. I'm right ready to go whether midnight, morning, or any time.'
"She summarized in her testimony her work in connection with these hotels when she said:
"`* * * I used to work in my business 14, 15, 16 hours, doesn't matter when. He is in the office. Everything I used to control, no time, no hours. Every morning I used to get up, go to my business. Every night, sometimes until 1:00 o'clock. We used to go home together, and I come back until 1:00, 2:00 o'clock I have to be in the hotel.
"`Q. You were the one? A. Sure, it is mine. I work with my heart and soul, sir * * *.'
"The comprehensive appraisal reports of McCune Company and Bishop & Company show that the Savoy Plaza, Somerset, Astor, and the Coral Reef hotels have a total of 343 rentable rooms. The Savoy Plaza is valued at $160,000.00, the Somerset at $230,000.00, the Astor at $160,000.00 and *212 the Coral Reef at $525,000.00, and these values are equal to or in excess of the purchase price which the defendant, Khudourie Chaachou, paid for them. That they were good revenue producers during the ten year period from 1942 to 1952 is plainly evident. The defendant, Khudourie Chaachou, testified that the profit from them was $250,000.00 a season. The plaintiff persuaded the defendant, Chaachou, to buy the Coral Reef Hotel for $250,000.00 while the Army was still in possession, and even against his lawyer's advice to buy up the outstanding lease for $225,000.00 which lease had an unexpired term of six years. When the Army released this hotel in 1945, the plaintiff redecorated the same in time for occupancy for the 1945 Christmas Season. The plaintiff testified:
"`* * * I worked very hard to put that hotel in order. Christmas, 1945, I opened that hotel. We were very, very successful, that hotel. The cheapest rent that hotel took was $25 a day without American Plan.
"`The cigar stand  just the cigar stand, $12,000 we got from the cigar stand. It was a most successful year. I remember that the rooms I rented $55 a day for four people, one room, without food.
"`Six months we were very successful, but I was very tired because we were running other hotels. I suggested, "Let us re-lease this hotel again." and so we put the agency to lease the hotel again, and we re-leased this hotel for five years, $112,000 a year.'
"When the lease mentioned in the plaintiff's testimony had expired, the defendant, Khudourie Chaachou, sold the hotel on June 6, 1951, for $1,225,000.00 and took back a mortgage to himself for $1,100,000.00 to evidence the balance of the purchase price. The mortgagor paid approximately $256,000.00 on this mortgage before he defaulted, so that it is apparent that this hotel produced the defendant, Chaachou, at least $816,000.00 in revenue by the time the parties separated or soon thereafter. This revenue was the direct result, in large measure, of the plaintiff's advice and her labor. The plaintiff's testimony seems fully justified in this record when she said: `Since I came into his life we have made lots of money'.
"That the defendant, Chaachou, led the plaintiff to believe, and that she did believe during this period, that she was his partner in these hotel operations, can hardly be doubted. A large part of this ten year period when she acted as such, the defendant, Chaachou, was engaged in the operation of his extensive rug business in New York, and left the actual running and management of the hotels to the plaintiff.
"The defendant, Chaachou, deliberately kept the plaintiff in ignorance of all financial matters, and she followed his wishes in this regard. He kept exclusive possession and control of all financial records. He handled them to suit himself and instructed her not to ask questions about them. All checks purporting to represent her share of her partnership income, which he gave her from time to time, she endorsed and delivered back to him on his pretext that he was `investing' the same for her. At one time he told the plaintiff that he had $55,000.00 of her money invested, and on another occasion said it was $75,000.00 but neglected to tell her and she did not know of what the investment consisted. Whenever it was necessary for her to sign documents or papers she obeyed his instructions without question and signed at the place he indicated for her signature. This was true of all of her income tax returns which he caused his accountant to prepare for her signature. When a copy of her 1946 income tax return was produced upon her counsel's demand at trial, which defendant, Chaachou, had kept in his possession and which had been prepared by his accountant, it reflected partnership returns from the four hotels of $26,000.00 which she testified she never received. This return reflected a deduction of $1,200.00 for `Entertaining *213 prospects and guests at taxpayer's home in capacity as manager and partner re: Coral Reef, Somerset, Astor and Savoy Plaza Hotels, Miami Beach, Fla. including special parties for Professional Women's Club of Miami, Fla.'
"Time after time in the record of this cause the plaintiff testified that she trusted the defendant, Chaachou, and it is evident that she did not only in her finances but in her personal relationship with him. She testified:
"`* * * I have trusted in him, and he took everything, of the books and everything else, and I took care of everything that goes into hotel, sir.'
"She also testified:
"`A. Armenian girls, when they are married to a man  they obey the husband no matter what he says.
"`Q. Is that the reason you signed this way? A. Yes sir; whatever he told me, I do exactly like he wants me to do.'
* * * * * *
"`Q. Did you ever read your income tax returns before you signed them? A. No, sir.
"`Q. Why didn't you? A. Because my husband used to tell me, "You don't have to read. Don't ask any questions to the accountant. Just do what I am saying." So I just think, well, he knows, and I just signed whatever he wants me to do.
"`Q. Don't you think it was rather foolish for a person just to sign, and not know what he was signing? A. No, sir; because I trusted him.
"`Q. Why did you trust him? A. Well, he is my husband.
"`Q. Is that reason enough for you? A. Well, that is enough reason. I have been obedient, because he has a violent temper. When I did not do something, he gets very upset. Sometimes he hits me.'
"She testified that the only checking account that she had was one in which defendant, Chaachou, put enough money for her to issue a check for the payment of her income tax, and that he had control of all the money. That when they got married, he gave her $100.00 a week allowance, which he later reduced to $75.00 a week, and finally to $50.00 just before they separated.
"She described her last meeting with the defendant, Chaachou, in the business office of the Savoy Plaza Hotel, on June 18, 1952, as follows:
"`* * * I was very tired, and I went to his office to talk to him after the season, I presented the bill that Dr. Minoyian sent, to write a check, and he says, "I am not paying any more of your bills," and he threw the bill at me. Then I said "When are we going to vacation, because I am exhausted, and tired, and I want to go to the summer home to rest. You look tired too. We will go." He said. "You are not going this year to the summer home." I asked him why, and he says, "Because I am selling the house."
"`That time I said, "Well, then I need some money. I want to get my allowance, so I can go and shop for a few things," and he says, "I am not giving you any more allowance either. I am sick and tired of you. I want you to get out of my life, and stay out."
"`I said, "What do you mean, I should get out of your life?" He says, "I told you I want you to get out of this building too. If not, I will throw you out with the law," and I said, "What are you saying? Why are you talking like that? Are you sick, or you are not feeling good"? He says, "No. I mean it, what I am saying. You have to get out of my life."

*214 "`I says, "Well, if I have to get out, all right. Let us come to an understanding of my share. I have worked with you all these years, and I don't know what I have, what I don't have, and if you don't want, we will go to court." He says, "Go to court. Go to court, and if the court decides a million dollars, I am going to give it to you. I told you, you have no share. You spent everything. You have no more allowance coming."
"`I said, "Khudourie, please honey, I don't want you to act like this. I don't want no lawyers. You know I never had lawyer, or anything like that together." "No," he says, "You got to go to court to finish this." I said, "Do you know any lawyer I can go to?" He laughed. He says, "Any lawyer I know?"
"`I said, "Didn't you promise me that you are going to love me, honor me, keep me forever?" He says, "Man can promise and take it back." I said, "What do you mean? This is no Bagdad or Russia. If you want to take your promise, we have to go to court to let the judge decide, and you give me my share. We will leave each other, divorce each other." "Oh," he says, "Divorce  don't you know that legally you are not married to me. I have affidavits to that." I said, "Put the false affidavits one side. You get them to sign affidavits. I know the kind people. Please, Khudourie, don't let Satan destroy you. We have done everything together. The Lord gave all this money to be used for His glory. I don't want you to mistreat me." He says, "Get out of my life. You have to go, and take your " I said, "Where am I going?" "Take the jewelery I bought you, sell it, buy a home. Get out of my life."
"`Then I was so shocked  I was so shocked that I can't tell you. * * *'
"Following this episode the defendant, Chaachou, wrote the plaintiff two letters which were introduced in evidence in this cause, the first dated July 1, 1952, and the second July 7, 1952. In the former letter defendant, Chaachou, advised the plaintiff:
"`Since you have neglected and not performed your duties for the past seven or eight days, and inasmuch as we were unable to contact you several times each day during the above mentioned period, we hereby notify you that your services are no longer required.
* * * * * *
"`Due to the termination of your services, the rent of your apartment will be $15.00 per day and is payable weekly in advance. Otherwise your apartment will have to be vacated by July 5th or before. * * *'
"In the latter letter he told her that:
"`Inasmuch as your Rent started from Saturday July 5th and has not been paid in advance to date, we hereby give you three days notice to vacate your apartment or pay your rent of $15.00 daily or $105.00 per week, in advance, according to the Florida State Law.'
"Throughout this entire record on the four occasions that plaintiff has been extensively examined by counsel for both sides, she has steadfastly maintained that she was defendant Chaachou's partner in his hotel business. That she worked with defendant, Chaachou, under that belief and that he encouraged her in her thinking is evidenced from the record. Indeed corroboration of her testimony was furnished by the defendant's admission that `she had a partnership' and by two documents which he offered in evidence purporting to constitute her a partner in the net profits derived from the operation of the Savoy Plaza and the Astor hotels, which were dated prior to the marriage of the parties and which the plaintiff testified she read *215 for the first time from the witness stand. The plaintiff testified that the defendant, Chaachou, advised her that she was a partner, not only in 20% of the net profits of the Savoy Plaza Hotel but of its ownership as well, and that as he acquired each of the remaining three hotels, he repeated a similar statement to her, with reference to them. The defendant denied this and attempted to reduce her to the status of an employee to avoid his obligation to her, not only financially but as her husband. Whatever partnership existed between the parties became merged in their larger partnership of marriage and its terms are now too indistinct to be specifically enforced as such. To allow him, however, to enjoy the fruits of his wife's labor from which he benefitted so substantially, as shown by this record, without any compensation to her for her contribution to the wealth he derived from these hotels, would constitute a gross inequity and result in his unjust enrichment, which should not be permitted under the rule announced by the Florida Supreme Court in the cases of Windham v. Windham, 144 Fla. 563, 198 So. 202; Strauss v. Strauss, 148 Fla. 23, 3 So.2d 727; Engebretsen v. Engebretsen, 151 Fla. 372, 11 So.2d 322; Giachetti v. Giachetti, 157 Fla. 259, 25 So.2d 658.
"In the Engebretsen v. Engebretsen case, supra, the Supreme Court of Florida said (11 So.2d at p. 329):
"`* * * When a wife contributes her industry and labor, or when she advances money to a business operated by her husband during coverture, she cannot be deprived of her property, because the law will not permit or allow a forfeiture thereof to the husband when marital difficulties appear on the horizon, but the fruits of her labor and industry, or the money, advanced, are special equities for adjudication. See Carlton v. Carlton, 78 Fla. 252, 83 So. 87; Taylor v. Taylor, 100 Fla. 1009, 130 So. 713; Heath v. Heath, 103 Fla. 1071, 138 So. 796, 82 A.L.R. 537; Windham v. Windham, 144 Fla. 563, 198 So. 202; Strauss v. Strauss, [148] Fla. [23], 3 So.2d 727.'
"In Giachetti v. Giachetti, supra, the Supreme Court of Florida said (25 So.2d at pp. 658, 659):
"`The chancellor personally heard the testimony and found the equities with the wife. She was granted a divorce, a one-third interest in a grove referred to as a young grove (properly described in the decree), a one-half interest in another grove and an allowance for attorney's fees and costs.
* * * * * *
"`The decree affecting the young grove (about fifteen acres) which found that the wife contributed about $250 or $275 to the purchase price is attacked for lack of any testimony. To be exact, the testimony does show that the husband owned this land before the marriage, however, there is evidence that the wife contributed her inheritance amounting to $273 to the planting of the grove; that in addition she worked and assisted materially in the development of the young grove until she was forced to leave by her husband.
"`We find no error in the decree and the same is affirmed.'
"Considering the fact that the value of all the hotels is equal to or in excess of defendant, Chaachou's original purchase price, and the large revenue which he derived from them through his wife's assistance and efforts, it is equitable that she should be, and she is hereby, awarded a special equity of three-twentieths (3/20ths) value of each of said four hotels, including its furniture, furnishings and fixtures, as shown by the appraisal report of Adrian McCune, M.A.I., filed in this cause, and that she be, and she is hereby, granted an equitable lien on each of said hotels, its furniture, furnishings and fixtures, as security for this value award.
"With reference to the residence at 5041 Collins Avenue, Miami Beach, the plaintiff *216 testified it was a present to her on the occasion of her marriage to the defendant, Chaachou. In this she is corroborated by two witnesses who assert that they heard the plaintiff say in the defendant, Chaachou's presence, on the occasion of the wedding reception, that the defendant had given her the home. (John Kulhanjian, 27-28; Mary Kulhanjian, 2859.) The plaintiff selected the residence and spent five months, with defendant's consent, in furnishing and redecorating it so that she and the defendant could get married and move into this residence when he returned from New York in December of 1944. After their marriage the plaintiff and the defendant, Khudourie Chaachou, lived in this home for almost six years until he ordered her to leave her home and take up residence at the Savoy Plaza Hotel for no apparent reason, except that at about this time he testified `he was more inclined to get rid of her anyway.'
"Counsel takes the position that this being an oral contract was within the statute of frauds, but the cases do not so hold. Exchange National Bank of Tampa, etc. v. Bryan, (1936) 122 Fla. 479, 165 So. 685; McDowell v. Ritter (1943) 153 Fla. 50, 13 So.2d 612. In the last mentioned case the Supreme Court, speaking through Mr. Justice Terrell, said:
"`The law is settled that the statute of frauds applies only to executory contracts and has no application to agreements fully performed on both sides.'
"That rule seems to be applicable to the instant case, and, therefore, the residence at 5041 Collins Avenue, Miami Beach, Florida, will be awarded to the plaintiff.
"On the question of divorce little need be said. Mrs. Chaachou testified that for no apparent reason her husband put her out of the house just before Christmas in 1949, and insisted that because of her pressing duties at the Savoy Plaza Hotel she should take up her residence there. In obedience to his command, she did move into the Savoy Plaza Hotel, but left her personal things at her home, and went back to her home each morning to have breakfast with him and returned each evening, until she found that defendant, Chaachou, was keeping company with one of his secretaries.
"If denying the fact of marriage, putting her out of the house, vigorously contesting the marriage, withholding from her support, when she was destitute, charging her with adultery after she had proven her marriage, and maligning her character by sending numerous letters to her attorneys (introduced collectively as Plaintiff's Exhibit 3-8) does not constitute extreme cruelty, it is difficult to think what would.
"On the question of adultery the defendant, Chaachou, undertook to prove same by (1) various acts of the plaintiff and one Avak Hagopian, and (2) testimony of John Durgin.
"Incidentally, it appears from the record that Mrs. Chaachou was born on March 3, 1906, and is therefore 54 years of age. She was 46 at the time the Complaint was filed. Avak is 34 years of age and was 26 at the time the Complaint was filed. Mrs. Chaachou has a son older than Avak.
"`The rule has commonly been abbreviated into the statement that proof of inclination and opportunity is sufficient to prove adultery; but this statement is correct only when it is understood that inclination means more than ordinary human tendencies, and must extend to proof of conduct reasonably suggesting specific libidinous tendency of each of the parties toward the other, and opportunity must be understood as meaning more than mere chance and must include the elements which would prove guilt beyond a reasonable doubt. However, according to some authority, whatever the disposition of the parties, the mere fact that the parties may have been in each other's company, under such circumstances that the act might have occurred, will not justify the conclusion that it actually did occur. There must be some circumstances, in *217 addition to the disposition and opportunity, tending to rebut the presumption of innocence, although proof of circumstances which lead a reasonable man to believe that the offense has been committed, in addition to an adulterous inclination and an opportunity to commit the crime, will justify a conviction,' Adultery, 2 C.J.S. Adultery § 24, p. 492.
"Of Avak, Mrs. Chaachou said:
"`Q. What place, if any does Avak Hagopian have in your life? A. Avak Hagopian is like my own son. I have done more to (sic) him that I have to (sic) my own son. The reason is that he is a man of God, lives according to the Lord's Will and he was helpless when he was here. He didn't know language (sic). It was a different country, strange. I have to interpret for him. I have to write letters for him. And they were writing letters from all over, and without me he couldn't do all this work, and I drove him wherever he wanted, because of motherly love I have towards him, like I to my own son.
"`Q. What association, if any, has Avak had with your family? A. He is just like one of our family.
"`Q. Is he presently related to you in any way? A. Yes. He is married to my sister's daughter.
"`Q. Did you ever sit on Avak's lap in the same chair with him? A. Never, never.
"`Q. Were you ever in Avak's room either you or Avak or both of you were in your sleeping garments? A. Never. Mr. Miles, I haven't lost my self-respect yet. I am a Christian. I love my God.'
"The plaintiff introduced in evidence at the final hearing of this cause a letter (Exhibit 3-11) over the signature of K. Chaachou, dated November 17, 1959, addressed to Mr. and Mrs. A. Balian of Auburn, New York, the body of which reads:
"`Reverand Avak and his foster mother, Fredericka, will be in Rochester Friday, November 25th, Saturday, the 26th, and Sunday, the 27th of November.
"`If you wish them to visit the Syracuse Church at your city, kindly communicate with them at that time  so that they can make a definite date in preparation.'
"The defendant attempted through various witnesses to show that the plaintiff had the opportunity to commit adultery with Avak. Avak stayed at the defendant's hotels at the defendant's suggestion. The defendant had full knowledge of his being there, his whereabouts at all times and the opportunities that were afforded him to commit adultery with the plaintiff. There is not one word in the testimony that either the plaintiff or Avak had the inclination to commit adultery with each other. He not only stayed at the hotels operated by the defendant in Miami Beach, but he went to the defendant's place at Tannersville in the Catskill Mountains of New York at the defendant's suggestion. He did not appear at the trial as a witness. The proof falls far short of that required to establish that the plaintiff committed adultery with Avak. Mrs. Chaachou testified positively that she had never had sexual intercourse with any man other than Khudourie Chaachou since she married him in December, 1944.
"Some years after this case was commenced, the defendant asked leave to file an amended answer charging the plaintiff with adultery. His motion to amend had two affidavits attached to it. One of them by one Donald Young.
"Donald Young was called as a witness in the case. The sum and substance of his testimony was that he saw the plaintiff and Avak up in Tannersville, sitting on a bench in broad daylight and Avak had his arm around her. Both were fully clothed. This *218 is far short of proving adultery. Now it may be conceded that the affidavit that this man made and which was attached to the defendant's answer charging adultery went further, but he repudiated everything else, except that they were sitting on the bench in broad daylight, and the man was leaning over her with his arm around her.
"Richard Bluver was a witness who testified that he had stayed at the Savoy Plaza (one of Chaachou's hotels) and that he met the plaintiff there in the drug store and they had a conversation which lasted about an hour. This was in 1949 or 1950, and that she told him that she was married to the `healer'. Suppose she did, it was false, if she said it, because she wasn't married to the `healer'. This witness also said that he read Chaachou's advertisement in a newspaper in which he offered $100,000 reward for information connected with the alleged plot against him in this case.
"Joseph W. Price said that he was a Minister of the Gospel, and that he was in Jacksonville to some kind of a meeting and came back in an automobile with Mrs. Chaachou and Avak. They spent the night in Winterhaven. There was another couple in the car, and when they pulled up to the motel, Mrs. Chaachou suggested that they would need three rooms, and he said, `No, we will need four rooms and then she said "one for you and Mrs. Price, one for Mr. Richer and one for Avak and I", and when I looked surprised she said "why Reverend Price it wouldn't be wrong for me to share a room with this child that God has given me," and I said "well if you think so, it is up to you", and she said "well, maybe I had better not", to which I replied "well, it would look better if you didn't"'. `She rented the rooms and brought him his key and he didn't know what the procedure was.' At any rate, even if this transpired, it doesn't appear that she actually occupied the room with Avak. Chaachou gave this witness $500.00 at one time and presently holds a mortgage on his house for $2,200.00. Also this witness admitted that, following this motel incident, he twice invited Avak to preach in his church, and that he believed him to be a `sincere and honest man.'
"Mack Davis, Jr., was a negro boy who was a bell hop at the Savoy Plaza Hotel. He also worked at Chaachou's residence. He testified that Mrs. Chaachou and her sister and the sister's daughter, Doris, and Avak occupied several rooms on the third floor of the hotel and that on some occasions he would go up to the suite and Mrs. Chaachou and Avak would be sitting on the same chair in one of the rooms. The door was not locked; he knocked and she told him to come in, which he did, and no comment was made about the situation. He also said she had on a negligee. This happened several times. He never told Chaachou about it and that is all there is to it. Mrs. Chaachou categorically denied this.
"Now except for the testimony of John Durgin which we will take up later, this is the sum total of the defendant's testimony about the plaintiff's adultery. You couldn't convict a negro preacher of stealing yellow legged spring chickens in Georgia on such evidence. It is wholly insufficient to make out the charge of adultery.
"Honi soit qui mal y pense.
"The only other bit of evidence regarding the plaintiff's alleged adultery was from the witness John Durgin who testified that on an occasion he visited the plaintiff at her residence on Collins Avenue and went to bed with her.
"As to that Mrs. Chaachou said:
"`Q. Now, you heard the testimony of Mr. John Durgin? A. Yes, sir.
"`Q. Tell the court whether or not the incident about which he testified to in which he said you went to bed together ever took place. A. Mr. Niles, such a ridiculous, horrible lie I have never heard in my life.
"`Q. Answer the question yes or no. A. Of course not, Mr. Niles.

*219 "`Q. Did you ever pick him up and take him to your house? A. Never in my life.
"`Q. Were you ever alone with him under the same roof? A. I never had any association with that man until I saw last year he came to the house with the sheriff.
"`Q. I ask you, Mrs. Chaachou, did you ever have any conversation  A. No.
"`Q. Please let me finish my question, Ma'am. Did you ever have any conversations with Mr. Durgin about Mr. Chaachou? A. No.'
"This Chancellor saw and heard Mr. Durgin. Apart and aside from the inherent improbability of his testimony, his manner on the witness stand was not at all convincing. He may have been influenced by Chaachou's newspaper advertisements offering $100,000.00 to any one who would furnish testimony in his behalf. This Chancellor believes him to be a liar and a perjurer and so brands him.
"On the question of alimony, this Chancellor, under date of October 24, 1956, made an order awarding the plaintiff $750.00 per month as temporary alimony. This was affirmed by The Supreme Court in certiorari proceedings (92 So.2d 414). It would seem that sum is sufficient for permanent alimony and it will be so ordered.
"The defendant has indicated his intention of pulling up stakes and leaving the State of Florida. If he carried out his threat the plaintiff may find that the award of alimony is ineffective. He will, therefore, be required to put up a surety bond, payable to the plaintiff in the sum of $180,000.00, conditioned upon the prompt and faithful payment by him of the alimony herein decreed to be paid to her during the remainder of his natural life. The injunctive order of this Court will be continued in effect until the bond is approved.
"Many times during the pendency of this litigation, defendant has failed to pay temporary alimony and it has been necessary for this Chancellor on numerous occasions to issue rules to show cause why he should not be held in contempt for his failure to make these payments. He has never actually been sent to jail for that reason, although he was sentenced to serve a period of confinement in the county jail for failure to permit the appraisers appointed by this Chancellor to inspect his property. He purged himself before the order took effect.
"With regard to attorneys' fees, three prominent members of the Miami Bar testified that a reasonable attorneys' fee for the plaintiff's attorneys would be from $150,000.00 to $175,000.00, allowing credit for $37,500.00 already paid. There was no testimony to the contrary. This averages out $162,500.00, giving credit for $37,500.00 previously paid under orders of court, or a net additional of $145,000.00, which sum is found reasonable and will be allowed.
"Concerning the corporate defendants, they are merely the alter ego of the defendant, Khudourie Chaachou. Owning all of their capital stock, with himself as President, they constitute but an agency or a convenient manner in which the defendant, Khudourie Chaachou, has chosen to hold the naked legal title to the Somerset, Astor and Savoy Plaza Hotels. They have no interest in this controversy apart from that of the defendant, Khudourie Chaachou, and except for the mechanics of working out the Final Decree they are unimportant to the outcome of this cause. In equity all of the hotels are the property of the defendant, Khudourie Chaachou.
"Wherefore, the premises considered, it is
"Considered, Ordered, Adjudged and Decreed as follows:
"1. That the equities of this cause are with the plaintiff, and she is entitled to the *220 relief for which she prays in accordance with this opinion.
"2. That the plaintiff, Fredericka Phillips Chaachou, and the defendant, Khudourie Chaachou, be, and they are hereby, divorced each from the other a vinculo matrimonii.
"3. That the temporary alimony heretofore ordered for the plaintiff in the amount of $750.00 each and every month be made permanent, and that the defendant, Khudourie Chaachou, pay her on the first of each and every month the sum of $750.00, and that he send the same to her at her residence.
"4. That the defendant, Khudourie Chaachou, post with the clerk of this Court a good and sufficient bond in the sum of One Hundred Eighty Thousand ($180,000.00) Dollars, to be approved by this Court, conditioned to pay the plaintiff the permanent alimony herein awarded as and when the same becomes due. That when said bond is posted and approved, the injunctive order of this Court dated the 10th day of April, 1959, and duly recorded in Chancery Order Book 1387 at Page 96, shall stand cancelled and vacated without further order of this Court.
"5. That the plaintiff be, and she is hereby, awarded a special equity equal to three-twentieths (3/20ths) of the value, as shown by the appraisal report of Adrian McCune, M.A.I., in each of the following described hotel properties:
"(a) The Savoy Plaza Hotel, located at 425 Ocean Drive, Miami Beach, Florida, the legal description of which is: Lot 6, Block 116, Ocean Beach No. 4, according to the plat thereof as recorded in Plat Book 3 at Page 151 of the Public Records of Dade County, Florida.
"(b) The Astor Hotel, located at 956 Washington Avenue, Miami Beach, Florida, the legal description of which is: Lots 1 and 2, less the west 135 feet, Block 35, Ocean Beach Number 3, as recorded in Plat Book 2 at Page 81 of the Public Records of Dade County, Florida.
"c) The Coral Reef Hotel, located at 3601 Collins Avenue, Miami Beach, Florida, the legal description of which is: Lots 1, 2, 7, and 8, Block 25, Ocean Front Amended, according to the plat thereof as recorded in Plat Book 5 at Pages 7 and 8 of the Public Records of Dade County, Florida.
"d) The Somerset Hotel, located at 335 Ocean Drive, Miami Beach, Florida, the legal description of which is: Lot 4, Block 115, Ocean Beach No. 4, according to the plat thereof as recorded in Plat Book 3 at Page 151 of the Public Records of Dade County, Florida.
"6. That three-twentieths (3/20ths) of the value of said hotel properties, according to the appraisal report of Adrian McCune, M.A.I., equals the sum of One Hundred sixty-one thousand, Two Hundred fifty ($161,250.00) Dollars, and there is hereby created and established upon said described hotel properties a first lien in plaintiff's favor in the said amount. That in the event the defendant, Khudourie Chaachou, shall not deposit with the Clerk of this Court within thirty (30) days from the date of this decree, for the use and benefit of the plaintiff, said sum of One Hundred sixty-one thousand, Two Hundred Fifty ($161,250.00) Dollars, then the Special Master appointed in this cause shall thereafter sell said hotel properties for cash to satisfy said lien of the plaintiff at public auction at the South front door of the Dade County Court House, at Miami, Florida, after first giving thirty (30) days public notice of the time, place and manner of said sale in some newspaper of general circulation in Dade County, Florida, four (4) insertions of such notice in such newspaper at least seven (7) days apart shall be taken and deemed sufficient public notice, and said hotel properties shall be sold on the first Monday succeeding the last advertisement of said hotel properties between the hours of eleven A.M., and two P.M., on that day; *221 that upon the said sale of said hotel properties by said Special Master, the lien of the plaintiff shall thereupon be reduced to the proceeds of said sale.
"7. That H.H. Eyles, Esq. be, and he is hereby appointed Special Master of this Court for the purpose of making said sale and the carrying out of the terms of this decree as herein provided.
"8. That the defendant, Khudourie Chaachou, within thirty (30) days from the date of this decree, sign, execute and deliver to the Plaintiff, Fredericka Phillips Chaachou, a good and sufficient warranty deed of conveyance, conveying to her, free of any outstanding real estate taxes, the residence property located at 5041 Collins Avenue, Miami Beach, Florida, which is legally described as Lot 9 and Out Lot 9, First Ocean Front Amended, According to the plat thereof as recorded in Plat Book 9 at Page 78 of the Public Records of Dade County, Florida. Upon default thereof, then this decree shall be taken and considered in all Courts of law or equity to have the same operation and effect as if said deed of conveyance had been executed conformably to this decree, and thereafter the defendant, Khudourie Chaachou, shall be conclusively deemed to have no interest whatsoever in said property, and the plaintiff, Fredericka Phillips Chaachou, shall be conclusively deemed to be the fee simple owner of said property.
"9. That the defendant, Khudourie Chaachou, pay to the plaintiff within thirty (30) days from the date of this decree, One Hundred Forty-five Thousand ($145,000.00) Dollars, as and for her attorney fees for her attorneys of record in this cause, which sum is found to be reasonable; that upon the default of the payment thereof, this sum shall be a lien upon the hotel properties described in paragraph five (5) of this decree, and the same shall be paid by said Special Master out of the proceeds of said sale of said hotel properties.
"10. That the defendant, Khudourie Chaachou, pay to the plaintiff within thirty (30) days of the date of this decree, Eight Thousand Four Hundred ($8,400.00) Dollars, for the use and benefit of Adrian McCune, M.A.I., and Bishop & Company, who testified in this cause and filed their appraisal reports herein, and in the default of such payment, this sum shall be a lien upon the hotel properties described in paragraph five (5) of this decree, and shall be paid by said Special Master out of the proceeds of said sale of said hotel properties.
"11. That this Court reserves jurisdiction of this cause for the purpose of enforcing the terms and conditions of this decree and entering such orders herein as may be necessary."
Appellant raises two points on this appeal: first, that the award of $750.00 per month permanent alimony is insufficient to meet her needs as evidenced by her testimony at the trial, and second, that the chancellor erred in not including in his award to her the furnishings of the home. Upon full consideration of these points, it is concluded that they are without merit. We observe that the chancellor stated in his findings of facts and conclusions of law that the appellee should pay $750.00 per month alimony "during the remainder of his natural life". He did not, however, include in the ordering part of his decree with reference to the $750.00 per month permanent alimony the words "during the remainder of his natural life". Consequently, the ordering part of the decree, to-wit, paragraph three, is without error for it permits the invocation if appellant should remarry of the case law in this jurisdiction to the effect that alimony ceases to be an obligation of the ex-husband upon remarriage of his former wife. Friedman v. Schneider, Fla., 52 So.2d 420, and cases therein cited.
The appellees have filed 64 cross-assignments of error. Most of these assignments have been abandoned by not being argued in appellees' brief. Florida *222 Appellate Rule 3.7, subd. i, 31 F.S.A. Appellees raise twelve points for review.
Of these twelve points there are but two which merit our consideration here. First, it is contended that the chancellor's decree is erroneous in that it is based on the uncorroborated testimony of Mrs. Chaachou as to the grounds for divorce. It is also contended that the chancellor erroneously considered as grounds for divorce, matters which arose after the filing of the complaint. Concerning the grounds for divorce, the chancellor included in his final order the following statement:
"If denying the fact of marriage, putting her out of the house, vigorously contesting the marriage, withholding from her support, when she was destitute, charging her with adultery after she had proven her marriage, and maligning her character by sending numerous letters to her attorneys (introduced collectively as Plaintiff's Exhibit 3-8) does not constitute extreme cruelty, it is difficult to think what would."
It does appear that the only testimony as to the grounds for divorce was given by Mrs. Chaachou. There was, however, documentary evidence, in the form of the letters referred to by the chancellor introduced as to acts of cruelty which occurred following the institution of the action for divorce. The question then is whether this documentary evidence relating to matters occurring following the filing of the complaint may be used to corroborate the testimony of the appellant. It is the opinion of this court that these matters were properly received in evidence and that when considered in conjunction with the testimony of Mrs. Chaachou provide an adequate evidentiary basis for the chancellor's granting of the divorce on the ground of extreme cruelty. When thus considered, the evidence discloses a course of cruel conduct toward appellant which began before and continued after the filing of the suit and thus serves to corroborate the appellant's testimony concerning the appellee's vilification, harassment and mistreatment of her during the existence of the marriage.
In the annotation on the subject of corroboration in divorce suits contained in 65 A.L.R. 169, upon which this court relied in the case of Martin v. Martin, Fla., 66 So.2d 268, it is pointed out that circumstances which develop during the trial of a divorce action may furnish the necessary corroboration. For example, in McAllister v. McAllister, 28 Wash. 613, 69 P. 119, it was held that the defendant husband's apparent insouciance exhibited at the trial toward his pregnant, penniless wife was corroborative of her testimony concerning his cruel treatment of her.
Regarding the letters from appellee which were received into evidence and considered by the chancellor, it has frequently been held that such communications between the parties may be considered as corroboration in a divorce proceeding. 65 A.L.R. 169 at page 179. See also Hunt v Hunt, 61 Fla. 630, 54 So. 390, wherein this court considered such a communication in connection with a charge of desertion.
The chancellor did not err, moreover, in taking into account as evidence of cruelty the appellee's answer charging appellant with adultery, a charge which, as the chancellor found, was wholly lacking in substance. In Grossman v. Grossman, Fla., 90 So.2d 115, 117, it was held that a prior unfounded action for divorce brought by a husband could be considered as an act of cruelty on his part. The court quoted from Nelson, Divorce and Annulment (2d ed.) Section 6.23, page 278-279, wherein it is stated: "The malicious institution of unfounded and unwarranted litigation by one spouse against the other may amount to cruelty or personal indignities." In Wright v. Thomas, 306 Ky. 763, 209 S.W.2d 315, it was held that in a divorce proceeding instituted by a wife, the husband's counterclaim for divorce containing an unfounded charge of lewd and lascivious conduct on *223 the part of the wife amounted to cruel and inhuman treatment. See also Wetherington v. Wetherington, 57 Fla. 551, 49 So. 549, holding that a husband's false charges of adultery may constitute extreme cruelty.
For the foregoing reasons, it is our opinion that the chancellor's findings regarding extreme cruelty are amply supported and corroborated by competent evidence of record, and that he did not err in granting the divorce in favor of the appellant.
Appellee further contends that the award of attorneys' fees in the total amount of $162,500.00 was erroneous in that such fees were grossly excessive.
We note that although the chancellor stated that credit should be given for the $37,500.00 attorneys' fees which had been previously paid he found a balance of $145,000.00 to be due. This was obviously a mathematical error because $37,500.00 deducted from $162,500.00 leaves a balance of $125,000.00. We merely mention this error in passing for it becomes a matter of no consequence by virtue of the conclusion which we reach hereinafter as to attorneys' fees to be allowed in this case.
We deem it appropriate initially to state that the record discloses the financial ability of Mr. Chaachou to pay reasonable fees to the attorneys who have represented his wife throughout this prolonged litigation.
The chancellor based his award of attorneys' fees on testimony of three expert witnesses to the effect that reasonable fees would be from $150,000.00 to $175,000.00. The uncontradicted testimony of such witnesses, although not binding upon the chancellor or this court, is very persuasive. Baruch v. Giblin, 122 Fla. 59, 164 So. 831. It is apodictic that the amount of attorneys' fees to be awarded to the wife's attorneys in a divorce action is a matter largely within the sound judicial discretion of the chancellor. Baker v. Baker, 94 Fla. 1001, 114 So. 661; Longino v. Longino, Fla., 67 So.2d 203. This Court should affirm an award of attorneys' fees unless it be determined that the chancellor has abused his sound judicial discretion in awarding fees so grossly excessive as to shock the judicial conscience.
This case has lasted nearly ten years and there have been numerous hearings and appeals. Testimony and depositions run into thousands of pages. The case has required the continuing and almost daily attention of counsel for appellant over the period of its pendency. The appellee has changed counsel on numerous occasions, thereby adding to the delay and to the difficulty of the case.
Mr. E.F.P. Brigham, chief counsel for Mrs. Chaachou, who is recognized throughout this state as one of the most able members of the Florida Bar, testified that he and other lawyers in his firm, exclusive of Messrs. Niles and Pilafian, spent more than two thousand to twenty-five hundred hours on this case and that counsel during the extended period of this litigation have been subjected to a continuous campaign of harassment and vilification by the appellee in the form of defamatory and intemperate letters written by appellee to innumerable public officials. Such maltreatment is a factor worthy of consideration in the fixing of appropriate attorneys' fees only in so far as such reprehensible conduct necessitated additional work on the part of counsel in investigating and refuting such malicious attacks.
Even contemptuous conduct on the part of a husband in a divorce case is, except as aforeindicated, no criterion for determining reasonable fees to be awarded counsel for the wife. In no instance should an award of attorneys' fees include a sum in the nature of punitive damages.
The financial status of the husband should be inquired into only for the purpose of deciding whether he is able to pay reasonable attorneys' fees for services rendered to the wife by her counsel. We do not mean to say that the value of properties *224 which might be the subject of litigation should not be considered in fixing reasonable attorneys' fees because the responsibilities and burden of and upon counsel for the wife increase, to some degree at least, in proportion to the values of such properties. The fundamental principles which are the criteria for the fixing of reasonable attorneys' fees, and which we have delineated in many of our prior decisions, should govern in this case as in all others regardless of the fact that appellee has not only vilified counsel for appellant but has also been the instigator of a campaign of postcard and letter writing (hundreds of such postcards and letters have been received by every member of this court) obviously intended to intimidate the recipients thereof. These postcards and letters have been written by persons who patently have been given only the picture of this fiasco limned by the appellant (in many instances they have contained contemptuous statements) because, as they have asserted, of promises of reward. It is significant but regrettable that the communications which are contemptuous have been penned by persons who reside outside the jurisdiction of this court. We are constrained to remark, "* * * Father, forgive them; for they know not what they do." Luke 23:34.
We return to the real question before this court  did the chancellor in allowing $162,500.00 abuse his sound judicial discretion and is his award so grossly excessive as to shock the judicial conscience? It is our view that under all the facts and circumstances the answer must be in the affirmative. In all fairness to the chancellor who decided this matter we must say we feel that he being human, and having had his patience worn threadbare by the conduct of the appellee, subconsciously awarded attorneys' fees which we have determined included an amount which must necessarily be considered as being in the nature of punitive damages. We hold that the amount of attorneys' fees fixed in this case is so grossly excessive as to shock the judicial conscience.
We reverse the decree of the chancellor upon this point and direct that total attorneys' fees in the sum of $100,000.00, less $37,500.00 heretofore allowed, be fixed, determined, allowed and enforced as reasonable attorneys' fees.
The remaining points raised by the appellees have been considered and are found to be without merit. For the foregoing reasons the order of the chancellor, except as herein modified, should be and the same is hereby affirmed.
It is so ordered.
ROBERTS, C.J., and HOBSON, DREW, THORNAL and O'CONNELL, JJ., concur.